[Civ. No. 1568.   Third Appellate District.—October 7, 1916.]

## NANCY SHELLMAN et al., Respondents, v. ELLA L. HERSHEY et al., Appellants.

NEGLIGENCE—FALL IN MAKING EXIT FROM OPERA HOUSE—DANGEROUS AND UNSAFE PASSAGEWAY—LIABILITY OF LESSEES.—In an action against the owners of an opera house and the lessees thereof to recover damages for personal injuries sustained by a spectator at an entertainment held therein, in passing out through a side door, which had been opened during the performance by the manager and agent of the lessees, at the request of spectators, for ventilating purposes, the lessees are liable in damages for such injuries, where it is shown that the door was not used or intended to be used as an exit or entrance, and that it was left open, unguarded, and unlighted at the close of the entertainment and with no step to aid a person in reaching the sidewalk three feet below.

31 Cal. App.—41

ID.—NONLIABILITY OF OWNERS.—The owners of the opera house are not liable in damages for such injuries, where it is shown that such door was not intended to be used and never was used for the convenience of patrons, but was intended for the use of and to be used only by lessees to take in and out stage properties and for the purpose of occasionally sweeping dirt through, or to air the house.

ID.—NUISANCE CREATED BY LESSEES—LESSOR NOT LIABLE.—Where property is demised, and at the time of the demise is not a nuisance, and becomes so only by the act of the tenant while in his possession, and injury happens during such possession, the owner is not liable.

APPEAL from an order of the Superior Court of Yolo County denying a new trial. N. A. Hawkins, Judge.

The facts are stated in the opinion of the court.

George Clark, and Black & Clark, for Appellants.

A. C. Huston, and H. L. Huston, for Respondents.

CHIPMAN, P. J.—This is an action commenced by plaintiffs to recover damages for an injury suffered by plaintiff Nancy Shellman in passing out through a doorway of the Woodland Opera House owned by defendants, the Hersheys, and under lease to defendants Henry and Giesea. The cause was tried by the court without the aid of a jury, and plaintiff had judgment for two thousand dollars and costs of suit.

Defendants, the Hersheys, moved for a new trial which was denied. They appeal from the order. Defendants Henry and Giesea appeal from the judgment on a separate transcript No. 1569, but do not appeal from the order.

The Woodland Opera House is situated on Second Street of the city of Woodland. The main entrance and exit of the auditorium is on Second Street at the southeast corner of the building. Along the east wall opening into the auditorium, about midway of the building, is a door opening from the dress-circle. It was in stepping out of this door that plaintiff, Mrs. Shellman, fell and received the injury of which she complains. The interior of the opera house is similar to most playhouses. In the center next to the stage is the parquet· surrounding the parquet by a half-circle are the dress-circle seats extending back to the rear wall; at the center of the rear wall is an exit door eight and a half feet wide leading from the dress-circle into the main entrance area; the center

aisle passes from this door down through the dress-circle and parquet; aisles also lead from this door along the south, east and west walls down to the stage. The defendants, the Hersheys, are and have been for many years the owners of this opera house and at the time of the accident, on the evening of May 29, 1912, it was under lease to defendants Henry and Giesea. It had been let by the lessees to the graduating class of the high school of Woodland for an entertainment that evening, for which a rental of $25 was paid to the lessees. Admission to the entertainment was free and the house was crowded with spectators, many standing in the aisles for lack of seating capacity. It is alleged in the complaint: "that the entrance to said opera house is on Second Street in the city of Woodland; that said opera house is so constructed that a door bearing the same relative position to the entrance leads onto Second Street from the main auditorium of the theater; that said door is built three feet above the sidewalk on Second Street; that during all times herein mentioned, there was no light over said door, and said door was not protected or guarded in any way, or at all; that said door as built and situated in said theater is unsafe, insecure, and dangerous to the patrons of said theater. That on the twenty-ninth day of May, 1912, said theater or opera house was leased to L. Henry and F. A. Giesea, but said door was in said building and was so built and located, and was not connected with the sidewalk by any steps or otherwise, or at all, and was not protected or guarded as above described, and was an unsafe and insecure and a dangerous passageway as above described, prior to the leasing of said opera house to said L. Henry and F. A. Giesea; that said owners had during all of the times herein mentioned full knowledge of the unsafe, insecure, and dangerous character of said door, and negligently permitted it to remain in such condition, and failed to properly or at all to safeguard it. That on the evening of the twenty-ninth day of May, 1912, plaintiff, Nancy Shellman, above named, attended a public entertainment at said opera house; that during said performance the above described door was left open; that at the close of said performance, as the spectators were leaving the building, plaintiff, Nancy Shellman, believing that said door was an exit from said theater, walked through said door and was violently precipitated upon the sidewalk; that at the time said plaintiff walked through said door it was unguarded

and unprotected, and there was nothing about said door to warn plaintiff of its dangerous or unsafe character. That by reason of said fall, the left arm of plaintiff, Nancy Shellman, was broken at the elbow; that the bones in said elbow were broken in such a way that they could not and did not properly mend; that said elbow is now stiff''; that she was otherwise injured as set forth in much detail.

In their answer, ''defendants deny that said door was constructed for use as an entrance or exit or that it was in any manner necessary'' for such use, or that defendants or either of them directed or sanctioned the use of said door as an entrance or exit in the use of said opera house; ''admit that said door was not connected with the sidewalk by any steps or otherwise . . . because said door was not an entrance to, or exit from, the said opera house in the use thereof by persons going into, or coming out of said opera house at the time the same was used for public entertainment.'' Deny that said door as built is or was unsafe or dangerous or that any act of defendants caused the same to be unsafe or dangerous; deny that on May 29, 1912, or at any other time, defendants had full or any knowledge that said door was unsafe or that they permitted it to remain unsafe; allege that when said opera house was leased to said Henry and Giesea, it was never understood that in the management thereof ''said doorway should at any time be or remain open as a means of entrance or exit . . . for the use of persons going into or leaving the same; . . . that on the occasion of giving said entertainment and after the audience was assembled, some person, whose name cannot be ascertained, requested one Robert Eastham, who at said time was employed by said L. H. Henry and F. A. Giesea, lessees of said opera house, to unlock said door; that said Eastham did thereupon, and pursuant to said request, unlock and open said door and allowed the same to remain open but all without authority, consent, or knowledge of defendants hereby answering, or either of them''; that said plaintiff, Mrs. Shellman, entered said opera house without any charge therefor and voluntarily; that the injury suffered by her in leaving said entertainment was caused by her own negligence ''in an effort to leave said opera house speedily and by an unusual means and by stepping out of the doorway mentioned in the complaint, which said doorway could be plainly observed . . . and, if the said Nancy Shellman suf-

fered the injuries mentioned in the complaint, they were the direct result of her negligent and careless conduct in so endeavoring to leave said opera house."

The findings of the court are substantially in accord with the averments of the complaint, and are challenged by defendants as not supported by the evidence. A diagram was introduced showing the sidewalk elevation along Second Street. "It shows the sill elevation and floor elevation of the door; in front of that door there is a concrete sidewalk; it is two feet five inches from the sidewalk to the sill of the door; it is nine inches from the sill of the door to the floor of the opera house. There is no step between the sill and the sidewalk. The door is seven feet four inches by three feet four inches. The door opens outward into the street."

Plaintiff, Mrs. Shellman, testified as follows: "I went to the opera house that evening by going up the front steps, the wide steps, on Second Street, and I went down into the lower floor of the opera house, walked around the wall, down to the door. I walked around there, there were no seats so I stood up there until the entertainment was over. There were a great many that did stand up. There wasn't seats. I was standing near the door, not a great ways from the stage, a yard or so from the door. The door was open all the time. I think people were going out there, that is why I stepped out. I thought they were going out there. There was several in between the door and myself where I stood and that is why I stepped out there. I thought I could step out there. The floor in the opera house inclines toward the rear. It seemed to me it was much lower there as I went down the side of it, it seemed so much lower that I could step right out on the sidewalk, that is why I stepped out. I thought I could step on to the sidewalk. The Court: Did you see the sidewalk when you stepped down? A. No, sir. Q. It was dark? A. Yes. Q. You looked out from a light room into the dark street? A. Yes, there was no light there as far as I could see, but I supposed I could step right on to the sidewalk. Mr. Huston: State whether or not there was anything there to prevent you from going out? A. No, sir; nothing there and nobody to tell me, nobody guarded the door. Q. The door was not guarded in any way? A. No, sir. Q. State whether or not the door was standing open or closed? A. Yes, it was standing open. The Court: Was that a warm

night? A. Yes, sir; it was warm, the 29th of May; it was very pleasant and warm. Mr. Huston: When was the first time you noticed the door was open? A. It was open all the time, I think, during the entertainment. Q. Just state to the Court how that door or opening looked to you that night. A. Well, it looked to me like a door right down near the sidewalk that I could step right out and without any harm, of course, or I wouldn't have stepped out. Mr. Huston: That is all.''

On cross-examination, she testified that she had been at the theater twice before, and both times had entered and left by the main entrance and did not see the other door on those occasions. ''There was no light in front of the door through which I stepped. There was no light only on the inside, the lights were inside the house. Q. Had there been a light at that exit or doorway through which you went the night you hurt your arm would you have been able to see whether there was or was not a step there or would you have been able to see how far the sidewalk was from the doorsill? A. Yes, I think I could have seen if there had been a light there. Mr. Clark: But you are rather emphatically of the opinion that there was no light there? A. Yes, sir. Q. You are a lady sixty-seven years of age, you stated? A. Yes, sir. Q. And in stepping through an exit that you never went through before you paid some attention to where you were stepping, you looked before you as you walked, didn't you, to that exit? A. Why, I walked to the door and just stepped, I just stepped through, I thought it was right on to the sidewalk of course, or I wouldn't have stepped through. Q. You were looking out of that doorway as you came to the doorway? A. Yes, I was looking out; I just started and went to that door and just stepped right through thinking I could step right on to the sidewalk. Q. Did you pay attention to where you were stepping? A. Yes, sir. Q. Did you endeavor as you went through the door to look to see whether you were stepping safely toward the sidewalk? A. I had no thought that it wasn't safe.''

Witness Eastham was the lessee's manager in charge of the theater at the time of the accident. He testified that he had the key to the door referred to and opened it and left it open during the entertainment. He testified: ''It was very warm that night, and it was very warm in there and oppressive, and

someone came and asked me to open the door, some one requested me, that there was a lot of ladies there about to faint but who it was I don't remember, so I unlocked the door but not for an exit. Q. You had been manager of the opera house for some time? A. Yes.'' He testified that it was not any one of defendants who made the request; that he had charge of the theater for Henry and Giesea and let the theater to the board of education and collected the rental for the lessees who had the theater for 1911 and 1912. The lease bears date August 26, 1910, and was executed by "Ella L. Hershey and Cornelia A. Hershey, executrices of the last will and testament of D. N. Hershey, deceased, the parties of the first part." It was admitted that when the lease was made, the defendants Hersheys owned the opera house, and that witness Eastham had been in charge of the opera house three seasons under other tenants before the lease to Henry and Giesea was executed, and had the key in his possession all the time. He testified that this particular door was used occasionally "to sweep some of the dirt out that way or take something in that way, but was never used as an exit or entrance"; that while he had charge "there was no box or step leading to that door whereby a person could step into that from the outside"; that he had no instructions from the lessees with reference to that door; that the Hersheys never gave him any instructions about that door; that it was locked that night before the witness opened it, and was always kept locked during entertainments; that he had been acquainted with the building since its construction and there never had been any step placed at that door, and that to make use of it as an exit or entrance a step would have been necessary.

Witness Clary was asked whether, during the time he was city marshal, the city trustees ever gave him any instructions in reference to the opera house. Over objection, the court allowed the answer if "connected with the defendants in some way." Answering yes, the witness was asked what the directions were. "A. Well, the board ordered me to notify them that they had to repair the sidewalk, and fix the step for a kind of fire-escape there." Defendants' counsel moved to strike out the answer as immaterial, irrelevant, and incompetent. Motion denied. "Mr. Huston: The step you mention was in reference to this door at the opera house? A. Yes, sir. Q. In obedience to these instructions, did you notify the de-

fendants Hershey concerning this condition?" Over defendants' objection, the court allowed the answer. "A. I know that I told Mr. Webber and I don't know but I think I wrote them a notice. Mr. Huston: To whom did you address your notice? A. To Mrs. Hershey." An objection was allowed to precede the answer on the same grounds and that it is not the best evidence. "The Court: The objection will be sustained unless it is connected, but for the present it will be overruled. Mr. Huston: You mailed this notice in the regular course of business? A. Yes, sir. Q. You also notified Mr. Webber? A. Yes, sir. Q. What connection, if any, did Mr. Webber have with this opera house? A. He was manager. Q. He had charge of it? A. Yes, sir. Q. What, if anything, did they do in reference to this notice that you gave them? Mr. Clark: Our objection is going to this. The Court: Same ruling. A. Put a box there for a step. Mr. Huston: At this same door? A. Yes; put a box on the sidewalk at that door. Q. When was that? A. That was after I told Mr. Webber, they put it there for a step." He testified that this was in 1909 while he was marshal and that his term expired in 1910. Defendants' attorneys moved to strike out all the testimony of Clary on various grounds: that no foundation was laid for it, nothing to connect the Hersheys with the transaction, and other grounds. "Mr. Huston: Mr. Clary, you put that letter in the postoffice at Woodland? A. Sure. Q. Mrs. Hershey lives in the city of Woodland? A. Lives in Woodland. Mr. Huston: This proof is offered in furtherance of our allegation in the complaint to the effect that the defendants Hershey had prior knowledge and actual knowledge of this door and its dangerous condition prior to the time of the accident. The Court: It doesn't appear who this man Webber is. Mr. Huston: Mr. Clary says he was the manager of the opera house. The Court: You say you told Mr. Webber this? A. Yes, I told him. The Court: The motion to strike out is denied."

Recalled as a witness for defendants, he testified: "I know the side door of the opera house was never used as an exit or as an entrance. I have been there in the opera house at performances. I have been there when people were going in and out."

Witness Curson, a city trustee from 1907 to 1911, testified that Clary was night watchman up to the time he was appointed marshal, and that during that time "the board gave

him directions to enforce some matters that the building committee of the board was asked to look into regarding fire-escapes, etc., and the protection of the building, and I think Mr. Clary was authorized to notify the owners of the building that such steps were necessary for the protection of the public at large in regard to fire-escapes, etc.''

Witness Eastham was recalled as a witness for defendants. He testified that he received the keys to the theater from Mr. Farrell, president of the Great Western Theatrical Circuit, and was employed by him and was the only manager of the opera house from that time; that the Farrell lease was made on August 1, 1908, and continued until Henry and Giesea took the theater; that ''Mr. Webber had nothing to do during that time with the booking of the shows or attending to that opera house''; that Webber was employed at one time as manager, previous to Mr. Farrell's time. He testified that he had known the opera house ever since it was built, and that in using it ''the entrance and exit to that lower auditorium for performance purposes has been through the main entrance over at the south wall.''

Defendant Cornelia Hershey testified that she and her mother acted for the others of the family in leasing the theater; that they got some notice about fixing the sidewalk in 1912, which was attended to, and the work done, but that she had been unable to find among their papers any notice sent them by Mr. Clary relative to that side door; that she knew there was no step there and that it was in that condition when they took the premises and when they leased them to tenants; that no step was ever maintained there, and the door had never ''been used as an exit or entrance to the opera house down to the time of this accident.'' She testified that she and her mother, as executrices, leased the opera house to the Great Western Theatrical Circuit, August 1, 1908, and that Mr. Eastham acted as manager. She testified that she never got any notice from Mr. Clary telling them to put steps at that central side door; that she ''got a notice from Mr. Scott regarding the fixing of the sidewalk in 1912,'' and it was done; that she had made it a practice to keep all papers served upon them, and had searched the files but could find no notice from Mr. Clary relative to that side door.

We do not think there can be any doubt of the lessee's liability. They, through their agent and manager, opened the

door in question and left it open under circumstances such as would and did lead the plaintiff, Mrs. Shellman, to believe that she could safely pass out at that door. Although this door was not used or intended to be used as an exit or entrance, the tenants are chargeable with knowledge that in opening and leaving it open, unguarded, and unlighted, with no step to aid a person in reaching the pavement, the passage out by that door was dangerous and unsafe. This situation was one of their own creation for which upon well-settled principles they were liable.

A much more serious question arises as to the owners' liability. They knew that this door had no step leading from it to the sidewalk; they knew this when they leased the premises to their codefendants, for it was in the same condition it had been in ever since they inherited the property in 1903 at the death of the original owner. But the uncontradicted testimony was that this particular door was not intended for use as an exit or entrance for patrons of the theater, and had never been used for that purpose in all the years of defendants' ownership. The only use to which it had ever been put was "only occasionally to sweep some of the dirt out that way or to take something in that way, but it was never used as an exit," and it was "always kept locked." Defendants, the Hersheys, had never given any directions concerning this door and personally had nothing to do with the management of the theater. Their liability must spring, if at all, from the single fact that they knew the location of this door, and also knew that no step or steps had been placed there.

Witness Clary's testimony that he "mailed notice to Mrs. Hershey," that he "deposited it in the postoffice at Woodland," does not meet the statutory requirements of such form of service, and at most would be but *prima facie* evidence which was rebutted by the testimony of Cornelia Hershey that no such notice was received. His testimony that he served the notice when city marshal was disproved by the record showing that in 1909 when he said he served the notice, he was not the city marshal. He was night watchman, however, and he was no doubt honestly mistaken as to when he became city marshal. If he served the notice in either capacity, it would be equally effective, but the proof of service is insufficient.

As to his having notified Webber, this may be taken as established. But Webber was not then the manager. Eastham was manager under the then lessee, Farrell's company. But, assuming that such notice was given to the Hersheys while the theater was under lease to the Farrell company, it would have conveyed no new fact to the Hersheys, for they admit that there never had been a step placed at this door. Their defense is that this door was not intended to be used, and never was used for the convenience of patrons to the theater, and was intended for the use of and used only by the lessees to take in and out stage properties, and was used occasionally to sweep dirt through or to air the house, but never as an exit or entrance for patrons or during performances.

Respondent relies upon the rule stated in note E to the case of *Griffin* v. *Jackson Light & Power Co.*, 92 Am. St. Rep. 526; "No person can create or maintain a nuisance upon his premises and escape liability for the injury occasioned by it to third persons. Nor can a lessor so create a nuisance and then escape liability for the consequences by leasing the premises to a tenant. Prior to and at the time of the lease, it was the duty of the lessor to put an end to the nuisance. If he fails to do this, and leases the premises with the nuisance on them, he may be deemed, and is deemed, to authorize the continuance of the nuisance, and is therefore liable for the consequences of such continuance. Whether, therefore, the defect be one of original construction, or arises from a failure to repair, or from the maintenance on the premises of any condition endangering the health or safety of strangers, whatever its nature, *if it constitute a nuisance,* the lessor will be responsible for its consequences if he leases the premises with the nuisance upon them, and thus authorizes its continuance." Among the cases cited in support of the text is *Kalis* v. *Shattuck*, 69 Cal. 593, [58 Am. Rep. 568, 11 Pac. 346] in which injury arose from an awning falling upon a person while passing under it. The tenant of the premises allowed the awning to be used by sight-seers going upon it, thus causing it to fall. It was not built or intended for such use, but only as a cover for the sidewalk from sunshine and rain, and was properly constructed for that purpose. The lessor was held free from liability for the injury. Said the court: "It is well settled that a landlord is not liable for such consequences, unless;

1. The nuisance occasioning the injury existed at the time the premises were demised; or, 2. The structure was in such condition that it would be likely to become a nuisance, in the ordinary and reasonable use of the same *for the purpose for which it was constructed and let* and the landlord failed to repair it (citing cases); or, 3. The landlord authorized or permitted the act which caused it to become a nuisance occasioning the injury." Quoting from *Gandy* v. *Jubber*, 5 Best & S. 485, "To bring liability home to the owner the premises being let, the nuisance must be one which was in its very essence and nature a nuisance at the time of letting, *and not something which was capable of being thereafter rendered a nuisance by the tenant. . . .*"

In notes B and C (p. 524) to the case from which respondents extract note E, *supra,* in 92 Am. St. Rep., the liability of the lessor of real property to third persons is considered. Note B points out the nonliability of the lessor to third persons for injuries arising from a nuisance not on the premises at the time of the lease, but which was erected or created by the tenant alone without the license or consent of the lessor. Note C is as follows: "The same considerations control where the nuisance is occasioned by a *misuse* by the lessee of the premises, or of appliances which were thereon at the time of the lease. It is not sufficient to render a lessor liable that the premises leased by him are capable of a use which will prove a nuisance to strangers. 'If a landlord demise premises which are not in themselves a nuisance, but may or may not become such, according to the manner in which they are used by the tenant, the landlord will not be liable for a nuisance created on the premises by the tenant. He is not responsible for enabling the tenant to commit a nuisance if the latter should think proper to do so. (Citing cases.) In such a case it may be said, in one sense, that the landlord permitted the tenant to create the nuisance, but not in such a sense as to render him liable. (Citing cases.) The landlord will not be liable for the use of the premises in such a way as to do harm, *merely because there was a manifest possibility of their being used in such a way.'* (Citing cases.) . . . Where, therefore, the premises, while capable of improper use, may be used in an ordinary manner without the creation of a nuisance, the lessor is not chargeable with the improper uses

of them by the tenant which results in a nuisance.'' (Citing cases.)

In *Owings* v. *Jones*, 9 Md. 108, the court, referring to *Rich* ·v. *Basterfield*, 4 Manning, Granger & Scott, 56 Eng. Com. Law, 784, said: ''After a full review of all the cases, and that too after a second argument, we understand the court to deduce, at least the two following principles from the numerous adjudications to which reference is had: First: That where property is demised, and at the time of the demise is not a nuisance and becomes so only by the act of the tenant while in his possession, and injury happens during such possession, the owner is not liable; but second: that where the owner leases premises which are a nuisance, or must in the nature of things become so by their user, and receives rent, then, whether in or out of possession, he is liable.''

Further reference to authorities seems unnecessary. We think it results from the principles above stated that the only question here is: Was this side door to the theater a nuisance when the premises were leased to defendants Henry and Giesea, or did it become such for the time being when the tenants used it for a purpose other than that for which it was designed and had, from the day the house was built, been used to the moment the present tenant misused it? We think the premises were not a nuisance when demised, and became so because of the manner in which the tenants used them on the night of the accident. It follows that the defendants, the Hersheys, are not liable for the injury complained of.

It is not necessary to consider any of the other alleged errors.

The order is reversed and a new trial granted as to defendants, the Hersheys.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 4, 1916.