[Civ. No. 4691.  Third Appellate District.—March 21, 1933.]

L. L. WOLFSEN, Respondent, v. DOOLEY P. WHEELER et al., Appellants.

F. M. Ostrander, District Attorney, and S. P. Galvin, Deputy District Attorney, for Appellants.

C. Ray Robinson and James D. Garibaldi for Respondent.

PLUMMER, J.—The plaintiff in this action had judgment against the defendants for the sum of $660, for and on account of the death of 46 head of sheep, alleged to have been the result of the negligent spreading of poison in a certain field which the plaintiff had leased for pasturing sheep Also, for the loss of the pasturage on the leased field.

The record shows that the plaintiff had leased a certain tract of land in Merced County for the purpose of pasturing sheep thereon; that prior to the time the plaintiff turned his sheep on to the leased field the defendants, for the purpose of killing rodents, had distributed a considerable quantity of thallium poison thereon. The defendant Wheeler, at all the times mentioned in the complaint, was the agricultural commissioner of the county of Merced, and the defendant Benton was a regularly appointed deputy acting under the direction and orders of the defendant Wheeler.

A number of specifications of error are set forth as grounds for reversal. However, it is only necessary to con-

sider whether the defendants were negligent, whether the plaintiff was guilty of contributory negligence, and the amount of the damages. The determination of these questions answers the specifications of error as to whether the court erred in not granting a nonsuit, in not directing the verdict and in refusing defendants' motion for a new trial.

It appears from the record that thallium is a virulent and deadly poison; that the manner of its use is to impregnate grain with the poison and place it in fields infested with rodents in such a manner that the infested fields will be rid of the pests. There is testimony in the record to the effect that the impregnated grain should be placed in the rodent holes. There is also testimony to the effect that the better way of poisoning rodents, and the manner followed in most instances, is to scatter the poisoned grain upon the surface of the ground and along the paths followed by the rodents. The record shows that in the instant case the grain was scattered on the surface of the ground along the paths used by the rodents, and in such a manner that sheep browsing on the premises ate the grain and died as a consequence thereof. The complaint alleges that the defendants were negligent in the manner in which the poison was scattered upon the field, the defendants' contention being that they were acting in their official capacity, and that they followed the usual custom pursued by them in the eradication of such pests.

First, as to the alleged contributory negligence of the plaintiff: The testimony in the record is sufficient to justify the conclusion of the jury that the plaintiff did not know the manner in which the thallium poison had been distributed over the leased field. His testimony is that he did not know the "manner and style in which the poison was placed there. I did not know this before I put my sheep in the field." The following are excerpts from the plaintiff's testimony: "Q. After the field was poisoned, when did you first notice the thallium on the top of the ground? A. Well, when the sheep died at the house I went up and looked at the field, and that is when I noticed the thallium on the top of the ground."

The plaintiff further testified that he had a conversation with Mr. Benton in relation to the distribution of the

poison and as to putting his sheep upon the field. His testimony is as follows: "Mr. Benton said after Monday they were going to start in poisoning on Mr. Haas' place and the sheep field that I had rented from Mr. Haas. I then said to him, 'If you are going to poison the field I have rented there you will have to put the poison down the holes as my sheep will eat it and do not put it on top of the ground.' Q. You state that you told him to put this poison down the holes, and not put it on top of the ground? A. Yes."

The plaintiff further testified that he and Benton had some argument as to where the grain should be placed, and that at that time the defendant Wheeler came along. They told him no good would come from putting the poisoning on top of the ground. The plaintiff told them it had to be put in the holes.

It is further contended that the plaintiff did not remove his sheep as soon as he should have done so, and thereby lost some of the sheep through his own negligence. His testimony is as follows: "Q. Now when was it that you first discovered the sheep dead, or any one of them? A. I cannot say as to that date. Q. Well, approximately? A. Well, I would say along about the 1st of July, somewhere along there. Q. Along about the 1st of July, and it was then you went down to this field, and discovered that there was thallium poisoning on top of the ground? A. Yes, sir. Q. Now, when you first went down there the 1st of July, how many sheep did you find dead? A. Well, I would not say just how many; I don't remember."

The record further shows that the plaintiff was not familiar with the properties of thallium poison; took the matter up with Dr. Thomas, and upon learning from him that the cause of the sheep dying was the eating of the thallium poison, he immediately removed the sheep from the field. The sheep were taken out of the field on the 16th of July. The pasture was not used on account of the poisonous condition, and was lost to the plaintiff. The fact that the plaintiff did not know of the properties of thallium poison, and did not understand the cause of the death of his sheep until it was explained to him by Dr. Thomas, and that he immediately removed his sheep from the field, were all matters to be taken into consideration by the jury in

determining whether the plaintiff was guilty of contributory negligence. The evidence on this question presented one of fact for the jury. (*Bellinger* v. *Hughes,* 31 Cal. App. 646 [160 Pac. 838].)

We do not need to cite authorities to the effect that where different conclusions might be drawn from the evidence by different minds, the finding of the jury thereon is conclusive upon the court.

There was also corroborating testimony to the effect that the plaintiff had told Benton to put the poison in the holes and not on top of the ground, and that he was going to place his sheep upon the leased premises.

The witness Messerschmidt testified that he scattered the poison on the top of the ground under the direction of Mr. Benton. The defendant Benton, among other thing, testified as follows: ''Q. Have you had occasion to poison a field belonging to Mr. Haas of some 110 acres? A. Yes, sir. Q. And under whose direction? A. Under my direction and supervision they started to work. Q. Just what did you do when you went out there? A. Well, I took the grain out there and put the men to work and showed them how much grain to put out and worked with them about an hour or an hour and a half. Q. Where was the poison placed? A. It was placed on the outside, back from the hole on a bare place.''

Mr. Brown, an expert, testified that thallium was a deadly poison; that it was the usual practice in cases where livestock are going about in the field that the poison is put in the holes.

Mr. Favier testified as follows: ''Q. Have you ever had experience with thallium poison? A. Yes, sir. Q. What experience has that been? A. Oh, it is deadly poison; anything that gets hold of it, it has got to go, that's all.''

The witness Keyes, leader of the rodent control for the United States Biological Survey, testified as follows: ''Q. Now, how do you instruct your men that thallium is a dangerous poison? A. We do instruct the men individually that exceptional care must be taken as to their duties. Q. So far as the standard of care required in a case of thallium or strychnine, what do you instruct your men as to that? A. The standard of care is to use more precaution in putting out thallium than we do with strychnine. Q. Be-

cause of the virulence which thallium contains you instruct them naturally, that they use much more care? A. Yes, that is to the operators in the use of thallium. Q. Is it not a fact that the United States Department of Agriculture has recommended that no thallium poison be given to any inexperienced people? A. Exactly.''

The record shows that the defendant Wheeler testified that the quantity of thallium used was excessive. The defendant Wheeler, among other things, testified as follows: ''Q. Your name is Dooley P. Wheeler? A. Dooley P. Wheeler. Q. And you are one of the defendants in this action? A. Yes, sir. Q. What is your position, Mr. Wheeler? A. Agricultural Commissioner. Q. Of Merced County? A. Yes, sir. Q. And does Mr. Benton work under you? A. Yes, sir. Q. In what capacity? A. As Agricultural Inspector. Q. He is a regular county government appointee, isn't he? A. Yes, sir. Q. Under one of the laws of the county government act? A. Yes, sir. Q. And operating out of your office? A. Yes, sir. Q. And working under your direction? A. Yes, sir. Q. And under your orders? A. Yes, sir, largely. Q. What do you mean by 'largely'? A. Well, they are not under our direction in every act they perform, no, but they are responsible in a measure for their success or failure. Q. In connection with the problem which was carried on in the Sandy Mush section, he was working with you in conjunction with that? A. Yes, sir. Q. And that work was being done under your supervision, was it not? A. Yes, sir. Q. And this particular poison in question was done under your supervision, was it not? A. Not this particular place in question, but in the general poisoning in that area that I had knowledge of, he was supervising it. Q. And the Haas property in that connection was the same as the rest? A. Yes, sir. Q. And so far as anything that was done down there was concerned, it was satisfactory to you, was it not? A. Yes, sir. Q. And at this time it is still satisfactory with you, is it not? A. The particular work under Mr. Benton, yes. Q. Mr. Benton is still in your employ, is he not? A. Yes, sir. Q. You have had full knowledge and information in connection with this situation, have you not? A. What particular situation? Q. The Haas and Wolfsen sheep poisoning controversy? A. I think I have. Q. That was reported

to you very fully? A. It has been since, but not at the time, no. Q. You made a personal check on it, did you not? A. Since, I have.''

We do not deem it necessary to set forth the testimony showing that the damages allowed are not excessive. It is sufficient to state that the reading of the testimony leads to the conclusion that the jury was justified in making its award.

The real contention advanced by the appellants in this case is that being public officials, they cannot be charged with negligence because of the manner in which the thallium poison was distributed, and that they pursued the usual custom of distributing the thallium so as to accomplish the intended purpose, to wit, the ridding of the fields of rodents. The fact that the appellants used the most effective means in accomplishing their intended purposes is no answer to the charge of negligence in the use of the poison. The conditions surrounding the use of the field, the intended use of the field, and the purposes for which the field was adapted must all be taken into consideration in determining whether the distribution of the thallium was in fact negligence. The effectiveness of the distribution is of course clearly established by the poisoning of the sheep as well as the rodents. The question arises—knowing that the field was to be used for pasturage purposes, what would men of prudence ordinarily do, and what precautions would they take in using a deadly poison? Would it be placed where the browsing animals as well as the rodents might readily partake thereof, or would it be placed where only the rodents would be likely to consume the poisoned grain? These questions seem to us to answer themselves.

Many definitions of negligence have been cited by counsel, but the following found in 19 California Jurisprudence, page 548, appears to us applicable: ''The failure to observe, for the protection of the interests of another person, that degree of care, protection and vigilance which the circumstances justly demand, whereby such other person suffers injury.''

We do not need to cite authorities to support the statement that the degree of care must be measured by the deadly character of the substance being used, and the likelihood that other animals than those intended to be poisoned might partake thereof. In the present situation the poisoned

grain was scattered in such a manner that any animal browsing thereon might be destroyed, whereas, had the poisoned grain been placed in the holes, no danger to browsing animals would have been attendant upon the use of the poison. We think that common prudence would dictate the proper place for distributing the poisoned grain.

■ Appellants advance the further contention that the defendant Wheeler is not liable for any acts performed by the defendant Benton. The testimony in the record shows that the defendant Wheeler not only had knowledge of the uses intended by the lessee of the field of pasture, but also understood and approved the manner of distributing the poison and had given directions concerning the same. Public officers are not ordinarily liable for the acts of subordinate officers, but wherever they participate in, or direct certain acts to be done or co-operate in the acts of negligence, they become liable. This is clearly set forth in 22 Ruling Case Law, page 487, as follows: ''Public officers and agents of the government are not liable for the acts or defaults, negligence or omission of subordinate officials in the public service, whether appointed by them or not, unless they direct the act complained of to be done or personally co-operated in the negligence from which the injury results.'' Stated conversely, public officers are liable personally to third persons who are injured by their personal neglect. Wherever a public officer directs the acts of a subordinate, to be performed in a particular manner, and that manner is negligent, the public officer is liable. He may also be liable by acquiescence therein, ratification and co-operation. (*Dowler* v. *Johnson*, 225 N. Y. 39 [121 N. E. 487, 3 A. L. R. 146]; see, also, 46 C. J., p. 1045.)

■ Nor is the contention of the appellants that they had been accustomed to scatter poisoned grain in like manner in other fields, or that other persons had scattered poisoned grain in like manner, a defense to a charge of negligence. (The record contains evidence that a proper and perfectly safe manner of poisoning rodents is to put the thallium impregnated in the holes dug by them.)

The case of *Webber* v. *Bank of Tracy*, 66 Cal. App. 29 [225 Pac. 41], involved a question of contract, and the court there held that where the parties contracted for the performance of an act according to the usual custom, it was

intended by the parties that the usual custom should be followed, and therefore negligence could not be predicated thereon. The language quoted from the opinion in that case is not a full or accurate statement of the law as applied to the circumstances disclosed by the record before us. No element of contract is here presented; it is simply a question of negligence.

In *Rudd* v. *Byrnes*, 156 Cal. 636 [105 Pac. 957, 20 Ann. Cas. 124, 26 L. R. A. (N. S.) 134], the court states the rule as follows: "The standard of care required of persons under given circumstances is not to be established by proof that others have been in the habit of acting in the same manner." This language is used in considering a question of negligence.

In *County of Alameda* v. *Tieslau*, 44 Cal. App. 332 [186 Pac. 398], custom, as the defense of negligence, is disposed of in this language: "The question was improper because no custom regarding the use of warning lights was shown, and a custom involving negligence cannot excuse it."

In *Phoenix Assur. Co.* v. *Texas Holding Co.*, 81 Cal. App. 61 [252 Pac. 1082], this court had presented for its consideration elaborate briefs urging custom as a defense to the alleged negligence. After a thorough consideration of the subject, we there said: "That a mere custom or usage cannot make due care out of conduct that is in fact negligence under the circumstances disclosed by the evidence has been stated a number of times by the courts of this state, as well as of other states. Likewise, that the standard of care required is not to be established by proof that others have been in the habit of acting in the same manner, and as cited with approval in the case of *Rudd* v. *Byrnes*, 156 Cal. 636 [105 Pac. 957, 20 Ann. Cas. 124, 26 L. R. A. (N. S.) 134], 'not even a general custom can be deemed a relevant fact in an action for negligence respecting any noncontractual duty which is not performed under fixed conditions', and, as stated in a citation from Utah hereinafter set forth (*Jenkins* v. *Hooper Irr. Co.*, 13 Utah, 100 [44 Pac. 829]), 'Local customs, when reasonable, uninterrupted, and uniform, in a locality or district, and not contrary to public policy, may affect the interpretation of contracts made in their locality, by raising a presumption that such contracts were made with respect to them; but such custom cannot

change the law of negligence,' and, further, as said in one of the Texas cases herein cited (*Gulf, C. & S. F. Ry. Co.* v. *Evansich,* 61 Tex. 3), 'While it is true that an established custom may be looked to, in many cases, for the purpose of determining what parties really intended by a given contract, and what acts in the performance of it will satisfy it, it may well be questioned whether in any case in which, in the absence of contract, express or implied negligence as an element, is the foundation of a right, custom may be set up for the purpose of showing that negligence docs or does not exist.' Without analyzing the various cases, it is sufficient to state that the following authorities all hold that where no contractual relations exist, and, further, where there is no assumption of risk, as is the case where the relation of master and servant is concerned, the specific practice of others cannot be admitted in testimony as an excuse for the alleged negligent act of the defendant." (Citing a long list of authorities to which reference is hereby made.)

We think the facts disclosed by the record show not merely an error of judgment, but a negligent use of a highly destructive poison, where common prudence required a high degree of care, a care commensurate with the known virulence of thallium poison, which care the record shows was not used.

The judgment is affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 20, 1933, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 18, 1933.