HENRY N. TUTTLE *vs.* GEORGE H. GILBERT MANUFACTURING COMPANY.

Worcester. October 4. — 20, 1887. C. ALLEN & KNOWLTON, JJ., absent.

A lessee of a building, who sustains personal injuries occasioned by the defective condition of the building, cannot maintain an action of tort against the lessor, founded upon a breach by the lessor of an agreement to repair the building within a reasonable time.

TORT. The declaration was as follows: "And the plaintiff says that, in the early part of the year 1884, he together with

his brother hired of the defendant a farm, with a house, barn, and other buildings thereon, the property of the defendant, situated in Ware, in the county of Hampshire, for the term of one year from April 1, 1884. At the time said premises were hired as aforesaid, the boards and planks making the floor in the barn were old, worn out, and defective, and in need of repair. As a part of the contract of hiring, and in consideration of the promise of the plaintiff and his brother, that they would hire said premises and pay rent therefor for said term, the defendant promised and agreed that it would immediately repair the said floor in a proper manner, and also further promised and agreed that if, in making the repairs upon said floor, it should be found that the timbers or joists upon which the boards and planks making the floor were laid, and by which said floor was supported, were poor, insufficient, unsuitable, decayed, or defective, it would replace all such timbers and joists with new and suitable ones. The plaintiff entered into possession and occupancy of said premises under said contract, and so continued until and after the injuries hereinafter complained of. The defendant, though often properly notified and requested to make said repairs, and after promising that it would do so, failed and neglected to make said repairs, or any part thereof, until after the date of the injury hereinafter complained of. On May 26, 1884, while the plaintiff was at work in said barn, in the exercise of due care, the timbers and joists supporting said floor being insufficient, unsuitable, decayed, and defective, gave way, and fell, with the floor and the plaintiff standing thereon, a great distance, to the ground or floor below, thereby greatly injuring the plaintiff in his person, causing him great pain and suffering, and much expense for care, nursing, medicine, and medical attendance, and rendering him unfit and incapable of performing manual labor during the remainder of his life. Said injuries were in no way caused by any fault or neglect on the part of the plaintiff, but wholly from the neglect and failure of the defendant to make said repairs, as it was its duty and obligation to the plaintiff to do." Answer, a general denial.

Trial in the Superior Court, before *Aldrich*, J., who allowed a bill of exceptions, which, after stating that the pleadings were made a part thereof, was in substance as follows:

The evidence showed that the plaintiff, in 1883, was living on a farm belonging to the defendant in Ware, recently purchased by the defendant, (the plaintiff being the first and only tenant since the purchase and not having lived there before,) under a lease expiring on April 1, 1884; and that in the month of March, 1884, it was decided that his brother Herbert should come to the farm and occupy it with him the following year, if satisfactory arrangements could be made with the defendant. Accordingly, application was made to one Dexter, the agent of the defendant, whose full authority was admitted, who said he would see the company and report.

The plaintiff called as a witness Herbert N. Tuttle, his brother, who testified as follows: " I first saw Dexter about March 1, when he drove up right opposite the barn, and stopped. I asked him if the place was going to be rented another year? He said he did not know, but would let us know in a few days. I told him I wanted to lease the farm with my brother. My brother was present at that time. Eight, or ten, or twelve days after, he drove down to the house and came into the sitting-room, where my brother and I were, and sat down. He said he had spoken to the company about renting the farm, and they had made up their mind to let us young men have it. I asked what the rent would be, and he said $400. Then I turned to my brother and asked him what he thought, and he said we would take it. I said, ' Now, Mr. Dexter, I will tell you what we want, if we take the farm and give you $400, we want you to put the buildings in repair,' and he said he would. He said, ' What repairs do you want? ' and we told him we wanted some repairs in the house, and, still further, that the barn wanted the doors fixed up, and the inside battened up, and the stable floor fixed. He said he would make the repairs. He sat a few moments, and said, ' Let us walk out to the barn and see what is wanted.' So we walked out, and I pointed to him the barn doors, and the side of the barn, all open, for him to batten up inside, and the stable floor; there were three or four places where the floor was broken through, and planks or boards nailed over them. I asked if he would put in new planks there, and he said he would, and said, ' When we take these old planks up, and put in new ones, if any other repairs are needed in the timbers underneath, we will fix

them, but I consider it safe.' I told him I wanted it fixed up because I had some cows that were very large, and I wanted it fixed safe. He said he would fix it. I moved over on April 1st or 2d, and put my cows into another barn on the place for a few days to feed out some hay, and kept the cattle in that barn for about two weeks. During these two weeks, Dexter drove around one morning, and said he thought he would call and see how the stock looked, and I spoke to Dexter and told him I should want to move the cattle up to the other barn as quick as I got the hay fed out, if he would have the floors fixed, and he said he would do it right off.

" Between April 21 and 26 the company sent down some men with sheathing and boards and shingles for the house, and the rest for the barn. They were about to shingle the house, and I told the carpenter that we could not have the house fixed then, because my wife, who had just been confined, was sick down stairs, and they went off.

" My brother was injured on May 26, 1884. About five o'clock that morning, we drove our cows into the barn and stanchioned them up, and he sat down and milked one cow before I got done, and then stepped into the barn floor to strain it out, and then sat down and was milking the second cow, and I stepped out into the floor to strain my milk, and just as I was going to bend over to strain it, I heard a noise, and I turned and looked, and he and the cattle were all gone. That was all the warning we had about it. Nothing more than two or three planks remained on the outside of the floor. This floor was large enough to tie up eight cows, and the fall was eight or nine feet to the ground below. I saw my brother down there, and I called to him, but he did not answer. I went down and found a cow lying across him, and a stick of timber right under his back. I got hold and lifted on the timber and got him out.

" I did not know of the dangerous condition of the barn. I drew the joists out afterward and cut them up. They were not sound. They were rotten where they went into the sill, and were all rotten at the end; some of the ends were broken off. When the men came to repair, after the injury, they took out the old sill and put in a new one. The timbers were all stained, and when I cut them up I found them in a rotten condition."

The plaintiff testified, in his own behalf, as to the extent of his injuries, and to the manner in which they were received; and as to the conversations with Dexter said: " I asked Dexter about renting the farm, and if they were going to rent the farm another year; he said he could not fully decide until he saw the company, and would let us know in a few days.  He afterwards came to my house.  My brother was present.  He, Dexter, came down and said the company had concluded to let the young men have the place another year; he said that he would rent it for $400 a year; then my brother spoke up and said he would take the farm at $400 and he wanted them to repair the buildings. The house leaked, and in the floor in the hall there were places that were rotted out, and also a room used for a kitchen.  He said he would put them in repair, and my brother then spoke about the barn, and Dexter said, ' We will go out to the barn and see what is wanted.'  My brother said he wanted the stable floor fixed, and the barn battened up, and also planked in the stable.  He showed him the door, then the battening of the side, then the putting in new planks, and he said he would take out what poor planks there were and put in new ones, and if there were any timbers needed underneath these that he would replace them, but to all appearances he considered it safe.  He said he would put in new planks, and if it needed any new timbers underneath these — but to all appearances he considered it safe — he would put them in, but could not tell until he took up the floor; he could tell better after they took up the floor, — could tell how the timbers were underneath.  We were then in the stable.  There were in the stable floor one or two short planks, and then one which was back from the short plank; then there was one right in front of the door that was broken; they were decayed, and then the places where they were broken, boards were nailed over except right by the door, and planks were nailed over that.  There were two or three of these."

The defendant offered as a witness William Dexter, who testified as follows: " I did not have any knowledge of any imperfection about the floor; I was there in the winter, when Henry occupied the place by himself, and looked under the barn.  I could not get under there on account of the manure.  I stepped under the corner, and looked through to see if everything was

all right, and pronounced it to be in good condition. That was in the winter, when Henry occupied the place by himself, in the winter before that spring."

Upon this evidence, the judge ruled that the plaintiff could not recover for his personal injuries; and ordered a verdict for the defendant. The plaintiff alleged exceptions.

*H. W. King & C. M. Rice,* for the plaintiff.

*W. S. B. Hopkins,* for the defendant.

MORTON, C. J. It is the general rule that there is no warranty implied in the letting of premises that they are reasonably fit for use. The lessee takes an estate in the premises hired, and he takes the risk of the quality of the premises, in the absence of an express or implied warranty by the lessor, or of deceit. A lessee, therefore, if he is injured by reason of the unsafe condition of the premises hired, cannot maintain an action against the lessor, in the absence of warranty or of misrepresentation. In cases where lessors have been held liable for such injuries to the lessees, the liability is founded in negligence. *Looney* v. *McLean,* 129 Mass. 33. *Bowe* v. *Hunking,* 135 Mass. 380, and cases cited.

The plaintiff admits the general rule, but contends that this case is taken out of it because, at the time of the letting, the defendant agreed to repair and put in a safe condition the stable floor, the unsafe condition of which caused the injury. The contract relied on is a loose one; it fixed no time within which the repairs were to be made, and it is doubtful whether the evidence proved any breach of contract on the part of the defendant. But if we assume that the contract was to make the repairs within a reasonable time, and that the jury would be justified in finding that the defendant had not performed it within a reasonable time, the question is whether, for such a breach, the plaintiff can maintain an action of tort to recover for personal injuries sustained by reason of the defective condition of the stable floor.

The cases are numerous and confusing as to the dividing line between actions of contract and of tort, and there are many cases where a man may have his election to bring either action. Where the cause of action arises merely from a breach of promise, the action is in contract.

The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise. Otherwise, the failure to meet a note, or any other promise to pay money, would sustain an action in tort for negligence, and thus the promisor be made liable for all the consequential damages arising from such failure.

As a general rule, there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract. In the case at bar, the utmost shown against the defendant is that there was unreasonable delay on its part in performing an executory contract. As we have seen, it is not liable by reason of the relation of lessor and lessee, but its liability, if any, must rest solely upon a breach of this contract.

We do not see how the cases would differ in principle if an action were brought against a third person who had contracted to repair the stable floor and had unreasonably delayed in performing his contract. We are not aware of any authority for maintaining such an action. If the defendant had performed the work contemplated by its contract unskilfully and negligently, it would be liable to an action of tort, because in such case there would be a misfeasance, which is a sufficient foundation for an action of tort. Such was the case of *Gill* v. *Middleton,* 105 Mass. 477.

The case of *Ashley* v. *Root,* 4 Allen, 504, does not conflict with our view, but recognizes the rule that to sustain an action of tort there must be more than a mere breach of contract.

The plaintiff now argues that he had the right to go to the jury upon the questions of warranty and deceit. It does not appear that this claim was made in the Superior Court; but it is clear that there is no sufficient evidence of any warranty that the stable was safe, or of any deceit or misrepresentation on the part of the defendant or its agent.     *Exceptions overruled.*