## MIDLAND OIL CO. v. THIGPEN et al.

(Circuit Court of Appeals, Eighth Circuit. December 9, 1924. Rehearing Denied March 23, 1925.)

No. 6469.

1. **Mines and minerals** ⬄125—**Action for damages for permitting waste water to escape on adjoining land held to sound in tort, and not to involve lease covenants.**

Action against lessee of mining property for damages caused to adjoining land by permitting waste water to escape on plaintiff's adjoining land sounds in tort, and does not involve covenants in defendant's lease from government or in its contract to assign such lease to the person actually responsible for the injury committed.

2. **Mines and minerals** ⬄5—**Driller having contract for assignment to him of oil lease on completion of well held to occupy to lessee from government the relationship of tenant in possession.**

Where government lease required lessee to drill a well, and lessee contracted with driller to assign lease to him on completion of well, the latter, having possession and control of the leased premises during drilling operations, occupied the same relation to lessee as if he held an absolute assignment of the lease; that is, he was a tenant in possession.

3. **Mines and minerals** ⬄121—**Lessee, whose sublessee or assignee enters into possession and control of property, has no greater duties to adjoining landowners than a landlord would have.**

On the assignment or sublease by lessee of oil-bearing lands, and the entry of assignee or sublessee into possession and control of the leased premises, the original lessee stands in a position similar to that of a lessor, and his duties and responsibilities to adjoining landowners are no greater than those of a landlord.

4. **Mines and minerals** ⬄124—**Lessee held not liable for driller's negligence in permitting refuse to escape, where driller was in possession under contract for assignment of lease.**

The lessee of oil property, who contracted to assign lease to driller on completion of well, *held* not liable for driller's negligence after latter took possession and control, and in his operations permitted refuse to escape on adjoining premises.

5. **Landlord and tenant** ⬄167(1)—**Tenant or occupant having entire control of premises is "owner," so far as negligent injuries to third persons are concerned.**

So far as liability for negligence to third persons is concerned, a tenant or occupant of premises having the entire control thereof is the "owner."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Owner.]

6. **Landlord and tenant** ⬄1—**Relation of "landlord and tenant" involves no question of agency, and does not make landlord liable for tenant's torts.**

The relation of "landlord and tenant" in itself involves no idea of representation or agen-

cy, but is a relation existing between two independent contracting parties; the landlord not being responsible to third persons for torts of tenant.

.[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Landlord and Tenant.]

**7. Mines and minerals ⚙══124—Lessor not liable for tenant's negligently· permitting refuse to escape on adjoining premises.**

To hold lessor of oil lands liable for permitting refuse to escape on adjoining lands, the nuisance causing such injuries must result from the reasonable, ordinary, and expected use of premises by tenant, or from the purpose for which they were leased, and where the use of the premises may or may not become a. nuisance, according as the tenant exercises ordinary care or uses the premises negligently, the tenant alone is liable.

**8. Mines and minerals ⚙══124—Successive lessees not cumulatively bound for negligence of subsequent lessee or assignee.**

Under Comp. St. Okl. 1921, § 7969, regulations promulgated by Secretary of the Interior, and rule 25 of Oklahoma Corporation Commission, imposing certain duties and restrictions on owners and lessees of oil-bearing lands, each of *several successive* lessees and *parties to* contracts for assignment or subletting of premises *held* not cumulatively liable for negligence of others in possession in permitting refuse to escape on adjoining property.

Stone, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Oklahoma.

Action by A. J. Thigpen and others against the Midland Oil Company. Judgment for plaintiffs, and defendant· brings error. Reversed, with directions to grant new trial.

S. N. Hawkes, of Bartlesville, Okl. (H. O. Caster and Hayes McCoy, both of Bartlesville, Okl., and George A. Henshaw and A. C. Hough, both of Oklahoma City, Okl.; on the brief), for plaintiff in error.

Frank T. McCoy, of Pawhuska, Okl. (A. M. Widdows, of Pawhuska, Okl., and J. R. Spielman, of Oklahoma City, Okl., on the brief), for defendants in error.

Before STONE and .LEWIS, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. A. J. Thigpen and A. J. Thigpen, Jr., members of a copartnership, hereinafter called plaintiffs, brought this action against Midland Oil Company, hereinafter called Midland Company, and Fred O. Davis, to recover damages for alleged injuries to cattle owned by the copartnership.

The Midland Company was the owner of a departmental oil and gas lease dated January 24, 1916, running from the Osage Tribe of Indians to the Midland Company, and covering the N. E. ¼ of section 17, township 24 N., range 9 E.

Paragraphs 16, 19, and 20 of the lease read as follows:

"16. This lease is subject to the regulations now or hereafter prescribed by the Secretary of the Interior, relative to such leases, all of which are made a part of this lease: Provided, that no regulations made after the approval of this lease' shall operate to affect the term of lease, rate of royalty, rental or acreage, unless agreed to by both parties."

"19. Assignment of this lease or any interest therein may be. made with the approval of the Secretary of the Interior and not otherwise.

"20. Each and every clause and covenant of this indenture shall extend to the heirs, executors, administrators, successors, and lawful assigns of the parties hereto."

, Sections 21 and 61 of the Regulations of the Secretary of Interior, approved August 26, 1915, read as follows:

"21. Approved leases or any interest therein may be sublet, transferred, or assigned with the consent and approval of the Secretary of the Interior, and not otherwise. Subleases, transfers, or assignments, when so approved, shall be subject to the terms and conditions of the original leases and the regulations under which such leases were approved, as well as to such additional requirements as the Secretary of the Interior may prescribe. The sublessee, transferee, or assignee shall furnish with his sublease, transfer, or assignment a satisfactory bond as hereinbefore prescribed in connection with leases.

"Any attempt to sublease, transfer, or assign an approved lease or any interest therein without the consent and approval of the Secretary of the Interior shall be absolutely void and shall subject the original lease to cancellation in the discretion of such Secretary."

"61. All B-S or water from tanks or wells shall be drained off into proper receptacles located at a safe distance from tanks, wells, or buildings, to the end that same may be disposed of by being burned or transported from the premises.

"Where it is impossible to burn the B-S, or where it is necessary to pump salt water in such quantities as would damage the surface of the leased land or adjoining property, or pollute any fresh water, the lessee

shall notify the superintendent who shall give instructions in each instance as to the disposition of such B–S or salt water."

Section 45 of the Regulations of the Secretary of Interior approved August 26, 1915, as amended May 13, 1919, reads as follows:

"45, as amended May 13, 1919.—Lessee shall provide two properly prepared slush pits, into one of which he must deposit sand pumpings and other materials · extracted from the well during the process of drilling, but other material as is suitable for the mudding of a well shall be run into the other pit. The construction of such pits shall be subject to the approval of the inspector. Sand pumpings and such materials shall not be allowed to run over the surface of the land."

The plaintiffs were the owners of three agricultural leases, running from members of the Osage Tribe to the plaintiffs, covering lands located in sections 17, 18, and 19, township 24 N., range 9 E., and lying adjacent to the tract of land covered by the oil and gas lease.

The oil and gas lease required the Midland Company to drill a well on the leased premises to the Mississippi lime unless oil or gas should be found in commercial quantities at a lesser depth.

On November 28, 1919, the Midland Company entered into a contract with its codefendant, Davis. This contract described the above-mentioned oil and gas lease, and recited that the Midland Company was the owner of mining leases covering adjoining lands, and was desirous of having the same tested for oil production, and provided:

"That for and in consideration of the sum of one ($1.00) dollar by the second party (Midland Company) to the first party (Davis) paid, the receipt of which is hereby acknowledged, and of the terms, covenants, agreements and conditions hereof, the party of the first part agrees to drill a well on the land hereinbefore specifically described at a proper location offsetting land held under lease by second party adjoining the same, in a proper manner and with due diligence, at his own costs and expenses, with proper tools and equipment, furnishing all the labor, tools, material, fuel, water and equipment, and to commence the drilling thereof within thirty (30) days from the delivery of the parts hereof, duly approved by the Secretary of the Interior, and to prosecute the drilling thereof with due diligence to a depth of three [    ] (300) feet in the Mississippi

lime, unless the drilling thereof is ordered stopped at a lesser depth by the superintendent of the Osage Indian Agency or other proper representative of the Interior Department of the United States, and to fully comply with the terms, covenants and provisions of said lease in so doing and with the requirements of the rules and regulations heretofore promulgated by the Secretary of the Interior, now in force, governing drilling operations in the Osage Indian Reservation and those that may hereafter be promulgated by said Secretary, and with the rules and reglations heretofore or hereafter promulgated by the Corporation Commission of the state of Oklahoma. * * *

"The party of the second part, in consideration of said drilling, agrees to execute and deliver to the party of the first part, upon the completion of said well, as aforesaid, an assignment of said lease hereinbefore specifically described. * * * *"

It further provided: That Midland Company should pay the rentals on the oil and gas lease falling due prior to the completion of the well and that Davis should reimburse it therefor on the execution and delivery of the assignment; that upon the failure of Davis either to commence the well within the time fixed by the contract or to prosecute the drilling thereof with due diligence, his rights under the contract should terminate; and that Davis should not acquire any interest in the lease until the assignment above referred to had been executed and delivered with the approval of the Secretary of the Interior.

This contract was approved by S. G. Hopkins, Assistant Secretary of the Interior.

Davis entered into a contract with one Martin, a drilling contractor, to drill the oil well. This contract provided that Davis should construct the derrick, rig, and slush ponds, and that Martin should furnish the tools and other equipment and drill the well at a certain price per foot. Davis constructed the derrick, rig, and one slush pond.

On February 10, 1920, Martin began the drilling of an oil well on the lease. About February 29, 1920, he encountered salt water; he bailed out about 75 barrels of the salt water and deposited same in the slush pond. This amount more than filled the slush pond and about 50 barrels of the salt water escaped and ran down into a creek which runs through the lands of plaintiffs. The cattle of plaintiffs drank this water,

with the resultant injuries for which damages are sought in this action.

The Midland Company had nothing whatever to do either with the construction of the slush pits, the drilling of the oil well or the permitting of the salt water to escape. The alleged wrongful acts complained of were caused wholly by Davis and his drilling contractor, Martin.

The cause of action set up in plaintiffs' amended petition sounded in tort. Plaintiffs alleged therein, in effect: That the Midland Oil Company and Davis were guilty of negligence, in that they failed to comply with the rules and regulations of the Department of the Interior, the laws of the state of Oklahoma, and the regulations of the Corporation Commission of the state of Oklahoma with respect to providing slush ponds for the purpose of catching salt water and other poisonous substance coming from the oil well, and in that they negligently permitted salt water and other poisonous matter coming from the oil well to escape and flow down onto the lands leased by plaintiffs; and that as a result of the negligent acts of the Midland Company and Davis, plaintiffs were damaged in the particulars set out in their amended petition.

The trial resulted in a verdict for the plaintiffs in the sum of $4,292. Judgment was entered on the verdict and the Midland Company sued out a writ of error therefrom to this court.

At the trial the court instructed the jury in part as follows:

"At the outset, you are instructed that the defense is not available to the company that it was relieved of liability by the fact that Davis was an independent contractor. The leases to the company and the regulations of the Interior Department were such that the company and Davis, and each of them, are responsible for the acts and omissions of Davis, and the agents, employees, and servants engaged in the drilling of the well and taking part in the construction and maintenance of the slush ponds used for the deposit of waste products including salt water, drawn from the well. * * *

"But the defendant oil company and defendant Davis had no right to construct or maintain or cause or permit persons employed at the well to construct or maintain ponds in such a way that the salt water would escape and enter the plaintiffs' cattle water supply. It was the duty of the defendants to so construct and maintain the ponds that salt water would be effectively

confined therein, and this was an absolute requirement of the law."

The Midland Company duly excepted to this instruction. It requested the court to instruct the jury that if Davis drilled the oil well in question under the authority given him by the contract with Midland Company dated November 28, 1919, and the Midland Company did not participate in the drilling thereof or direct or control the work of drilling, the jury should not return a verdict against the defendant, Midland Company. The court refused to instruct the jury as requested and Midland Company duly excepted.

[1] 1. Counsel for plaintiffs contend that the provisions of the lease and the regulations promulgated by the Secretary of the Interior which by reference were made a part of the lease, imposed a positive duty upon the Midland Company which it could not avoid by entering into the contract with Davis, and that the violation thereof by Davis or his drilling contractor rendered the Midland Company liable for the damages to the cattle of plaintiffs.

Whether or not an action could be maintained against Midland Company for a breach of the covenants of the lease, either by the lessor, or by the plaintiffs upon the theory that certain covenants of the lease were made for their benefit, is not before us. As above stated, the action sounded in tort. It was predicated upon alleged negligence. Upon that theory, it was presented both to the trial court and to this court. Therefore, the liability of the Midland Company to plaintiffs, if any, must be based upon the breach of a legal duty to plaintiffs imposed by law upon the Midland Company.

At the outset it is important that we determine the relation of Midland Company, Davis, and plaintiffs to the lease, to the leased premises, and to each other, at the time the wrongs complained of were committed.

Clearly plaintiffs were strangers to the lease, to the demised premises, and to Midland Company and Davis. They were occupiers of adjoining property.

Paragraph numbered 19 of the lease provided that the lease, or any interest therein, might be assigned with the approval of the Secretary of the Interior. The regulations provided that the lease, or any interest therein, might be sublet, transferred, or assigned, with the consent and approval of the Secretary of the Interior, and that subleases, transfers, or assignments when so

approved should be subject to the terms and conditions of the original lease and the regulations under which such leases were approved, as well as to such additional requirements as the Secretary of the Interior might prescribe. Midland Company covenanted to assign the lease to Davis on the performance by him of certain things set out in the contract, namely, the commencement of the drilling of an oil and gas well on the lease within the time specified in the contract and the prosecution of the drilling thereof with due diligence. The contract would have been the same in legal effect if the Midland Company had agreed to assign the lease to Davis at a future date upon the payment by him on such date of a stipulated cash consideration. It was an executory contract to assign the lease. It gave to Davis the equitable title to the lease. It did more, it placed Davis in possession and gave him the right and imposed upon him the duty to perform the covenants of the lease with reference to the drilling of the well and to reimburse Midland Company for rentals paid by it in the meantime. From the date of the execution, delivery and approval of this contract, Midland Company had no longer the right nor was it in position to drill the oil well. There was no interest left in Midland Company except the legal title to the lease. Davis held the equitable title subject to the condition that it might be defeated upon his failure either to commence within the time specified the drilling of the well or to prosecute the drilling thereof with due diligence. The language of the contract that Davis should acquire no interest in the lease until the execution and delivery of the formal assignment must be read in the light of the other portions of the contract which clearly passed the equitable title, and when so construed must be held to mean that Davis would not acquire the legal title until the execution and delivery of the assignment. Plaintiffs in their amended petition alleged: " * * * Davis is the owner of an interest in and to said leasehold, under and by virtue of" the contract entered into between Midland Company and Davis. Davis therefore acquired by this contract an interest in the lease, to wit, an equitable assignment thereof with the right to the control and possession of the leased premises, and upon completion of the oil well, to receive the formal assignment and the full benefit of any oil discovered and developed on the property.

After the execution of the contract Midland Company did not retain either possession or control of the leased premises. The same passed to Davis, and at the time of the commission of the wrongs complained of Davis was the occupant in full control thereof.

[2] Davis having possession and control of the leased premises his relation thereto was substantially the same as if there had been an absolute assignment of the lease. He was a tenant in possession. See 1 Tiffany on Landlord and Tenant, § 158, p. 974, and section 65, pp. 379 to 381, inclusive.

[3] Upon the assignment or sublease by the original lessee and the entry into possession and control of the leased premises by the assignee or sublessee, the original lessee stands in a position similar to a lessor, and his duties and responsibilities to third persons are no greater than that of a landlord. Note, 92 Am. St. Rep. 507; Miller v. McElin et al., 208 Ill. App. 605; Kilroy v. City of St. Louis et al., 242 Mo. 79, 145 S. W. 769, 772; Borman v. United Merchants' Realty & Improvement Co., 264 Pa. 156, 107 A. 682; Clancy v. Byrne, 56 N. Y. 129, 15 Am. Rep. 391; Kelly v. United Cigar Stores Co. (Sup.) 170 N. Y. S. 933.

From the foregoing we conclude that the relation of Midland Company was that of lessor or landlord, and Davis that of equitable assignee in lawful possession and control of the leased premises.

[4] First, then, did the covenants of the lease impose a legal duty on Midland Company so that a breach thereof by Davis gave rise to a cause of action in tort against Midland Company in favor of plaintiffs? A somewhat similar question came before the Supreme Court of Iowa in the case of Willis v. Snyder, 190 Iowa, 248, 180 N. W. 290. In that case, the plaintiff, a licensee of the tenant of a dwelling house, brought an action against the landlord, who had covenanted in his lease to keep the premises in repair and suitable for use, for personal injuries alleged to have been caused by the negligent failure of the landlord to repair the steps leading from the front porch to the walk or ground below. The court said:

"The allegations of negligence are based upon the failure of the landlord to repair the steps within a reasonable time after express notice thereof had been given him by the tenant. Counsel's principal reliance is upon Flood v. Pabst Brewing Co., 158 Wis. 626, 149 N. W. 489, L. R. A. 1916F, 1101; Barron v. Liedloff, 95 Minn. 474, 104 N.

W. 289; Frischberg v. Hurter, 173 Mass. 22, 52 N. E. 1086. In so far as these cases sustain a recovery based upon tort for damages resulting to a tenant because of the failure of the lessor to maintain the premises in repair as agreed in the lease, they are opposed to the overwhelming weight of authority. Hill v. Day, 108 Me. 467, 81 A. 581, Ann. Cas. 1913C, 971; Anderson v. Robinson, 182 Ala. 615, 62 So. 512, 47 L. R. A. (N. S.) 330, Ann. Cas. 1915D, 829; Glynn v. Lyceum Theater Co., 87 Conn. 237, 87 A. 796; Cromwell v. Allen, 151 Ill. App. 404; O'Neil v. Brown, 158 Ky. 118, 164 S. W. 315; Korach v. Loeffel, 168 Mo. App. 414, 151 S. W. 790; Kohnle v. Paxton, 268 Mo. 463, 188 S. W. 155; Davis v. Smith, 26 R. I. 129, 58 A. 630, 66 L. R. A. 478, 106 Am. St. Rep. 691, 3 Ann. Cas. 832; Dustin v. Curtis, 74 N. H. 266, 67 A. 220; Miller v. Rinaldo, 21 Misc. Rep. 470, 47 N. Y. S. 636; Shackford v. Coffin, 95 Me. 69, 49 A. 57."

In the case of Dustin v. Curtis, 74 N. H. 266, 67 A. 220, 11 L. R. A. (N. S.) 504, 13 Ann. Cas. 169, the New Hampshire court, in a well-reasoned opinion touching this question, said:

"The plaintiff claims that he was there as the tenant, or as a guest of the tenant. It is doubtful whether the evidence is sufficiently definite to warrant either conclusion; but if we assume that the plaintiff was present as a tenant, that one of the terms of the tenancy was that the defendant should make all necessary repairs, and that the plaintiff's injury was due to the defendant's omission to repair, it does not follow that this action of tort for negligence can be maintained against the defendant because of her omission in this respect, unless her failure resulted in the breach of a duty imposed by law, as well as the breach of an obligation created by the agreement of the parties. * * *

"In Courtenay v. Earle, 10 C. B. 73, Jervis, C. J., in speaking of the case of Boorman v. Brown, 3 Q. B. 511, said: 'That case will be found to proceed upon the principle that, where there is an employment which employment itself creates a duty, an action on the case will lie for a breach of that duty, although it may consist in doing something contrary to an agreement made in the course of such employment by the party upon whom the duty is cast. * * * Before that case it had been supposed, upon the authority of Corbett v. Packington, 6 B. & C. 268, that the violation of a bare promise, without any such general duty, might

be the subject of an action of tort. That clearly is not so. Without altogether destroying the well-known distinction between actions of contract and actions of tort, I think we cannot hold the counts in this declaration to be well joined.' In Legge v. Tucker, 1 H. & N. 500, Pollock, C. B., in stating the distinction between actions of contract and actions of tort, said: 'When the foundation of the action is a contract, in whatever way the declaration is framed, it is an action of assumpsit; but when there is a duty ultra the contract, the plaintiff may declare in case.' And in Tattan v. Railway, 2 E. & E, 844, Cockburn, C. J., in considering the subject, said: 'Whatever may be the distinction between an obligation arising out of a contract and a duty imposed by the common law on persons entering into a contract, it is impossible to refer to the cases to which our attention has been called, without seeing that they establish that a duty was imposed upon the defendant (common carriers) * * * by the custom of the realm so soon as they entered into the contract with the plaintiff, and independently of the terms of the contract itself. The plaintiff might, had he thought fit, have brought his action on the contract; but he was also entitled to sue the defendants for the breach of their common-law duty. Having chosen the latter course, he cannot, according to the authorities, be said to have brought an action of contract. * * * The action is an action on the case, not in form only, but in substance.' See, upon the same subject, Tuttle v. Company, 145 Mass. 169, 13 N. E. 465; Rich v. Railroad, 87 N. Y. 382; 1 Ch. Pl. (16th Am. Ed.) 196.

"In accordance with the foregoing authorities, it may be stated as a principle of law that, where the only relation between the parties is contractual, the liability of one to the other in an action of tort for negligence must be based upon some positive duty which the law imposes because of the relationship, or because of the negligent manner in which some act which the contract provides for is done; and that the mere violation of a contract, where there is no general duty, is not the basis of such an action. This being so, and the relation between the parties to this suit being that of landlord and tenant, and it having been decided in Towne v. Thompson, 68 N. H. 317, 44 A. 492, 46 L. R. A. 478, that no duty is imposed by law upon a landlord to make repairs upon leased premises for the benefit of his tenant or a member of the

tenant's family, it follows that the present action cannot be maintained because of the mere failure of the defendant to keep her agreement to repair. In fact, it is generally held that a tenant, a member of his family, or his guest, cannot sue a landlord in tort for personal injuries due to his omission to repair premises which have passed into the possession and control of the tenant, even if the landlord has agreed to make repairs. Shackford v. Coffin, 95 Me. 69, 49 A. 57; Tuttle v. Company, 145 Mass. 169, 13 N. E. 465; Davis v. Smith, 26 R. I. 129, 58 A. 630, 66 L. R. A. 478, 106 Am. St. Rep. 691; Schick v. Fleischauer, 26 App. Div. 210, 49 N. Y. S. 962; Frank v. Mandel, 76 App. Div. 413, 78 N. Y. S. 855; Stelz v. Van Dusen, 93 App. Div. 358, 359, 87 N. Y. S. 716; Kushes v. Ginsberg, 99 App. Div. 417, 91 N. Y. S. 216; Sherlock v. Rushmore, 99 App. Div. 598, 91 N. Y. S. 152; Boden v. Scholtz, 101 App. Div. 1, 91 N. Y. S. 437; Feary v. Hamilton, 140 Ind. 45, 39 N. E. 516; 1 McAd. L. & T. 438; Jones, L. & T. § 592; 18 Am. & Eng. Enc. Law (2d Ed.) 231, 234; 24 Cyc. 1115."

We therefore conclude that the breach of the covenants of the lease did not give rise to an action in tort in favor of the plaintiffs.

[5, 6] Second. Is the Midland Company responsible to plaintiffs for the negligence upon or misuse of the property by Davis and his drilling contractor, Martin?

A tenant or occupant of premises having the entire control thereof is, so far as third persons are concerned, the owner. 16 R. C. L. p. 1095, § 613; City of Lowell v. Spaulding, 4 Cush. (Mass.) 277, 50 Am. Dec. 775; Maloney v. Hayes, 206 Mass. 1, 91 N. E. 911, 28 L. R. A. (N. S.) 200.

The relation of landlord and tenant in itself involves no idea of representation or of agency. It is a relation existing between two independent contracting parties. The landlord is not responsible to third persons for the torts of his tenant. In Norton v. Wiswall, 26 Barb. (N. Y.) 618, it was sought to make the proprietor of a ferry responsible for the wrongful act of the servant of the lessee of the ferry. In that case the court said:

"Where one is the master or principal of another, he is responsible for his acts within the scope of his employment, because he has conferred authority upon the latter to do the act, and because he has the power and the legal right to control his conduct. Where one is the partner of another, he is liable for his acts within the scope of the partnership, because he has agreed to be so, and because the very nature and object of this relation imply that each acts with the authority and assent of the other. But where the parties stand towards each other simply in the light of contracting parties, having no relation towards each other which draws into operation the principle of agency, the rule does not apply. Such is the condition of lessor and lessee. The lessee, for the time being, takes the place and assumes the duties and obligations of the lessor. He is a substitute for the lessor. He acts independently of him. He cannot be controlled by him. He has an agreement under which, in consideration of a stipulated compensation, he is, for the time being, clothed with the rights and responsibilities of the lessor. The lessee of a house or a farm is, during the continuance of the lease, owner—at least quasi owner. He has the rights of owner. The lessor cannot, without his consent, set foot upon the premises. The lessee of a ferry has similar and equal rights. By the very terms and legal effect of the lease the lessor is displaced from the possession and temporary ownership of the ferry. He cannot run it. He cannot control it. He cannot give directions in regard to it. He has no more rights in regard to it than a third person. To attempt to take possession or to exercise control, or to give directions, would be to make him a usurper, an intruder—a trespasser. How then can he be liable for the acts of the lessee? The servants of the lessee are not his servants. He cannot control them. He cannot give them orders which they are bound to obey. They owe no allegiance or service to him. Having no power over them, and having conferred no authority upon them, he is not responsible for their acts. He stands in no relation to them which makes applicable to him the maxim 'respondeat superior.'"

[7] In order to make the landlord liable to the owner or occupant of adjoining property for injuries caused by the improper use of the demised premises by his tenant, the nuisance causing such injuries must necessarily result from the reasonable, ordinary and expected use of them by the tenant, or from the purpose for which they were leased, and if the use of the premises by the tenant may or may not become a nuisance according as the tenant exercises ordinary care, or uses the premises negligently, the tenant alone is liable. The landlord will not be liable for injuries caused

by the misuse of the premises by the tenant merely because there was a manifest possibility of their being used in such a way. 16 R. C. L. p. 1074, § 593; note, 92 Am. St. Rep. 524; Maenner v. Carroll, 46 Md. 193; Wood on Landlord & Tenant (2d Ed.) § 536; Langabaugh et al. v. Anderson, 68 Ohio St. 131, 67 N. E. 286, 62 L. R. A. 948; Murray v. McCormick et al. (Springfield Court of App., Mo.) 232 S. W. 733; Pennington v. Klemanski, 278 Pa. 591, 123 A. 491; Meyers v. Pepperell Mfg. Co., 122 Me. 265, 119 A. 625; Rice v. White et al. (Mo. Sup.) 239 S. W. 141; Shellman et al. v. Hershey et al., 31 Cal. App. 641, 654, 161 P. 132; Baker v. Allen, 66 Ark. 271, 50 S. W. 511, 74 Am. St. Rep. 93; Murray v. Richards, 1 Allen (83 Mass.) 414; Todd v. Collins, 6 N. J. Law, 127; Ferguson v. Hubbell, 26 Hun, 250; Edgar v. Walker, 106 Ga. 454, 32 S. E. 582; Clifford v. Atlantic Cotton Mills, 146 Mass. 47, 15 N. E. 84, 4 Am. St. Rep. 279; Gardner v. Rhodes, 114 Ga. 929, 41 S. E. 63, 57 L. R. A. 749; Metropolitan Savings Bank v. Manion, 87 Md. 68, 39 A. 90.

In Maenner v. Carroll, supra, the court said:

"If a landlord demise premises which are not in themselves a nuisance, but may or may not become such, according to the manner in which they are used by the tenant, the landlord will not be liable for a nuisance created on the premises by the tenant. He is not responsible for enabling the tenant to commit a nuisance, if the latter should think proper to do so [citing Owings v. Jones, 9 Md. 108; Rich v. Basterfield, 4 Com. B. 805, 56 Eng. Com. L. 782]. In such case it may be said, in one sense, that the landlord permitted the tenant to create the nuisance, but not in such sense as to render him liable."

In Langabaugh et al. v. Anderson, supra, the plaintiff brought an action against the lessor and lessees in an oil and gas lease to recover for the burning of plaintiff's building on a lot adjoining the leased premises through the alleged negligence of the lessees, whereby oil escaped from a tank on the leased premises, and flowed under the building and thence down the slope of a hill to a creek, where it came in contact with a fire, which followed back the track of the oil and burned plaintiff's building. The lessor had leased her premises for the purpose of producing oil or gas therefrom, reserving to herself one-eighth of the oil produced, delivered in tank or pipe lines. She reserved no control or right to direct the manner of drilling or of the erection of tanks on the leased premises, but surrendered complete possession and control thereof to the lessees during the term of the lease. The court in holding that the lessor was not liable said:

"Merely permitting another to commit a nuisance does not render one liable for its consequences. Wood on Landlord & Tenant (2d Ed.), in section 536, sums up a discussion of the liability of the landlord as follows: 'The rule may be stated, as the result of the authorities, to be that, in order to charge the landlord, the nuisance must necessarily result from the ordinary use of the premises by the tenant, or for the purpose for which they were let; and where the ill results flow from the improper or negligent use of the premises by the tenant, or, in other words, where the use of the premises may or may not become a nuisance, according as the tenant exercises reasonable care, or uses the premises negligently, the tenant alone is chargeable for the damages arising therefrom.' We have observed that the storage of crude oil is not of itself a nuisance to adjacent or adjoining premises; and if the lessor even knew that oil would be produced by drilling and stored on the leased premises, she would not be contemplating the creation or maintenance of a nuisance, unless she also knew that it would be negligently stored and cared for by the lessees, and it cannot be held as a matter of law that the lessor should presume that the lessees would be negligent in that behalf."

In Miller v. McElin, supra, the court said:

"As to third persons and the public generally, they [the original lessees], as owners of the term, could put somebody else in possession, control and occupancy as tenant and free themselves from liability for his negligence on the same principle and to the same extent that any owner of an interest in land may in that manner do. * * * She [appellant] also says where the landlord has leased the premises from which the overflow originated, the tenant, being the one entitled to possession and control, is liable for the negligent use of such premises, citing Chicago Tel. Co. v. Commercial Union Assur. Co., 131 Ill. App. 248, and Lederer v. Fox, 151 Ill. App. 300. This is a correct statement of law applied to negligence in caring for a water pipe and to many other acts of negligence of tenants as will appear by reference to Thompson on Negligence (2d Ed.) § 1154 et seq. It ap-

plies not only as between the owner of the fee and his tenant but also to subletting, notwithstanding a contract duty of the sublessor to his landlord to keep the premises in repair. Id. 1161. The owner is not liable for nuisances created during the term of the lease. Id. 1162. It is not a question of title but of legal occupancy and control. Id. 1166. If appellees had put some other man in possession as a tenant it would hardly be conceived that because they were owners of an estate for years they were more liable than if they had owned the fee. We see no difference in principle."

In the case of Murray v. McCormick et al., Springfield Court of Appeals, supra, the owner of a tract of agricultural land leased it to a tenant. The land was planted to wheat. The tenant employed one McCormick to thresh the wheat. The engine of the threshing outfit was placed in close proximity to the house of plaintiff on an adjoining tract of land. It had no proper spark arrester. Sparks escaped, set on fire, and burned the household goods of the plaintiff. The plaintiff brought an action against the owner of the land to recover damages upon the theory that the same were caused by a nuisance existing on the latter's property. The owner of the property had no control over the placing or management of the engine. The court held the owner not liable, and, after citing many authorities, said:

"From these authorities we can declare the rule to be that, where land is leased for a certain use, from which use a nuisance will naturally arise, the landowner will be liable to strangers who are injured by such nuisance necessarily arising from the contemplated use; but if the nuisance does not necessarily arise from such contemplated use, but through the manner in which the lessee uses it, the landowner will not be liable in damages to strangers."

We therefore conclude that Midland Company was not liable for the improper or negligent use of the leased premises by Davis.

[8] 2. Counsel for plaintiffs further contend that the regulations promulgated by the Secretary of the Interior, section 7969, Comp St. Okl. 1921, and rule 25 of the regulations of the Corporation Commission of the state of Oklahoma imposed certain legal duties upon the Midland Company which continued after the contract between Midland Company and Davis, and that the wrongful acts of Davis and his drilling contractor constituted a violation thereof rendering the Midland Company liable to plaintiffs. In our opinion the regulations of the Secretary of the Interior were not intended to apply to the Midland Company after it had assigned the lease. By the express terms of the lease and regulations, upon the execution, approval and delivery of a sublease, transfer or assignment, the regulations became binding upon, and the duties imposed thereby devolved upon, the successor of the lessee. The lease obligated, not the Midland Company solely, but either the Midland Company or its assigns, to drill the well in accordance with the terms of the lease and the regulations. By the assignment Davis acquired an interest in the lease and covenanted to drill the well. Upon the approval of this assignment by the Secretary of the Interior, the terms of the original lease and the regulations became binding upon Davis, and as contemplated by the Secretary of the Interior when he framed the regulations and the original parties to the lease when they executed the same, the duty of drilling the well devolved, not upon the Midland Company, but upon Davis, its assignee. Under such circumstances we do not believe these regulations were intended to bind cumulatively each succeeding owner of the lease or to create a cumulative liability. They were rather intended to operate upon the person who owned the lease or an interest therein and who actually developed and operated the same whether he be lessee, sublessee, transferee or assignee. They do not fall within the class of statutes enacted for the protection of the general public and which impose primary and nondelegable duties.

The Oklahoma statute above referred to reads as follows:

"No inflammable product from any oil or gas well shall be permitted to run into any tank, pool or stream used for watering stock; and all waste of oil and refuse from tanks or wells shall be drained into proper receptacles at a safe distance from the tanks, wells or buildings, and be immediately burned or transported from the premises, and in no case shall it be permitted to flow over the land. Salt water shall not be allowed to flow over the surface of the land."

This is a penal statute. Midland Company had nothing whatever to do with the drilling of the oil well or the permitting of the salt water to escape. Clearly, a violation of this statute by Martin, the drilling contractor, was not a violation thereof by Midland Company. By invoking this statute plaintiffs attempt to hold Midland Com-

pany for a tortious act, to the commission of which it was in no way a party.

Rule 25 of the Corporation Commission reads as follows:

"Fresh water, whether above or below the surface, shall be protected from pollution, whether in drilling or plugging."

There is nothing in the regulation of the Corporation Commission to indicate an intent to make the same applicable to an owner who has leased and surrendered control and possession to his tenant or to a lessee who has assigned or sublet and surrendered control and possession to the assignee or sublessee. To so hold we would have to read into the regulation language not contained therein.

We therefore conclude that the Midland Company violated no legal duty imposed upon it by law in favor of the plaintiffs, and that no cause of action in tort ever accrued to plaintiffs as against the Midland Company.

It follows that the court erred in its instructions to the jury above set out, and in failing to give the instruction requested by the Midland Company. The cause is reversed, with instructions to grant Midland Company a new trial; and it is so ordered.

STONE, Circuit Judge (dissenting). If the rule as to independent contractor is here applicable and if Davis is such a contractor, of course, the Midland cannot be held, no matter what rule of liability is applicable as to the one legally responsible for the injury.

The contention made here is that Davis was not only an independent contractor but a sublessee or assignee of the lease. There may be a difference of vital importance between these relationships. Hence, the necessity of determining the true legal relationship between Davis and the Midland Oil Company. This is revealed in the contract between them and the approval thereof by the Interior Department. That contract provides that Davis shall, at his own expense, drill a well on this land to a certain depth; that the consideration therefor is expressed thus:

"The party of the second part, in consideration of said drilling, agrees to execute and deliver to the party of the first part, upon the completion of said well, as aforesaid, an assignment of said lease hereinbefore specifically described, and to pay all rentals provided for in said lease falling due prior to the completion of said well to said depth; provided, however, said second party shall be reimbursed by said first party for such rental payments upon the execution and delivery of said assignment."

It further provides:

"It is further agreed by and between the parties hereto that the said party of the first part is not to receive, and does not hereby acquire, any interest in said lease until said assignment is executed and delivered as herein provided for, and duly approved by the Secretary of the Interior." It provides also that the contract shall not be binding until it is approved by the Secretary of the Interior. That approval was secured and is expressed as follows:

"Approved with the understanding that no interest in the lease will be acquired by Fred O. Davis until an assignment is executed in accordance with the regulations and approved by the department."

These quotations from the contract make it very clear that neither Davis nor the Midland Oil Company nor the department intended the contract (either presently or upon performance) to operate as an assignment of the lease or as the conveyance of any legal interest therein. Such assignment was to come after performance; was to be a formally executed and delivered instrument; and was subject to the approval (or disapproval) of the department. Both the contract and the "approval" thereof by the department definitely and carefully set out that no "interest in" the lease is acquired by Davis until such an assignment so approved is delivered. The injury complained of here occurred during the drilling and months before such assignment was even requested. While the record shows that an assignment was attempted to be given later, it shows no approval thereof by the department; no assignment has ever been recorded nor any bond of Davis as such assignee recorded. Therefore, no valid assignment has been shown to have been made even to the date of trial. To my mind, the above establishes that Davis was in no sense an assignee of the lease or a sublessee. Davis never has had and, as far as this record shows, has not now any legal interest in this lease. He is not sublessee, transferee nor assignee thereof. Since the definitely and carefully expressed intention of all of the parties was that Davis should have no "interest in" the lease until the formal assignment was delivered and approved and since no assignment was delivered until long after this injury and since no approval has yet taken place and since an attempted assignment without such approval is "ab-

solutely void" (Regulations No. 21), how can this lessee be heard to claim that its interest in or liability on account of the lease has been completely parted with?

In my judgment, Davis was an independent contractor. Casement v. Brown, 148 U. S. 615, at page 622, 13 S. Ct. 672, 675 (37 L. Ed. 582), where the court said:

"The will of the companies was represented only in the result of the work, and not in the means by which it was accomplished. This gave to the defendants the status of independent contractors. * * * "

The general rule is that a defendant is not liable for a tort committed by an independent contractor. But this rule while general is not without exceptions. The application of this general rule is not a little restricted by several exceptions which are of some practical as well as legal importance. Among such exceptions are the following: (1) Where the injury is the direct result of the work contracted for; (2) where the work contracted for is likely to cause injury unless precautions are taken; (3) where injury is the result of nonperformance of absolute (nondelegable) duties of defendant; (4) where the act contracted for is unlawful. Every jurisdiction has decisions announcing the general rule and the exceptions thereto. Clear statement of these principles and extended lists of citations may be found as follows: 26 Cyc. 1546–1566; 14 R. C. L. 79–108; a series of valuable notes in 65 L. R. A. at pages 445, 620, 742, and 833, and in 66 L. R. A. at page 119; a valuable note in 76 Am. St. Rep. page 382.

The general rule and the exceptions are settled law but there is, naturally, considerable variation in the application of these recognized principles by different courts or by the same court at different times. It is not always easy to determine whether the facts of a particular case place it within the general rule or within an exception and, if the latter, it sometimes is difficult to decide within which exception or exceptions to the rule the case falls. 26 Cyc. 1557.

The trial court determined that this case was not governed by the general rule for he charged that the defense of independent contractor was "not available" and that both the Midland Oil Company and Davis were "responsible for the acts and omissions of Davis." The court delivered no opinion and did not indicate which exception to the general rule he regarded here applicable.

Measuring the present facts by the above statement of the law, I think this case falls within the exceptions and is not governed by the general rule.

It is within the first of the above exceptions because the injury is the direct result of the work contracted for. Chicago v. Robbins, 2 Black, 418, 17 L. Ed. 298; Robbins v. Chicago, 4 Wall. 678, 18 L. Ed. 427; St. Paul Water Co. v. Ware, 16 Wall. 576, 21 L. Ed. 485; Thomas v. Harrington, 72 N. H. 45, 54 A. 285, 65 L. R. A. 742 and note. It was the natural and necessary result of digging a deep well, such as here contracted for, that various kinds of fluid wastes (including salt water) would be encountered and would have to be disposed of on the surface. The regulations of the department, governing drilling of such wells, recognize this situation and require "slush pits" to be prepared to receive such refuse. Regulations to Govern the Leasing of Land in the Osage Reservation, Oklahoma, for Oil and Gas Mining Purposes. Approved August 26, 1915. Paragraphs 45 and 61 and Amendments thereto. Approved May 13, 1919. If it be said that the injury here resulted not from the drilling contracted for but from the failure to confine and control the salt water, then the second of the above exceptions applies. That exception is applicable where the work contracted for is likely to cause injury unless preventive precautions are taken. In the leading case of Bower v. Peate, L. R. 1, Q. B. D. 321, at 326, Lord Cockburn has very well said:

"There is an obvious difference between committing work to a contractor to be executed from which, if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted. While it may be just to hold the party authorizing the work in the former case exempt from liability for injury, resulting from negligence which he had no reason to anticipate, there is, on the other hand, good ground for holding him liable for injury caused by an act certain to be attended with injurious consequences if such consequences are not in fact prevented, no matter through whose default the omission to take the necessary measures for such precaution may arise." Also see note at 65 L. R. A. 833, and Jacob Doll & Sons v. Ribetti, 203 F. 593, 121 C. C. A. 621 (3d C. C. A.). The evidence here shows that the natural and the necessary consequence would be injury to

users of the water of this stream unless pollution from this well were prevented.

This case is, also, within the third of the above exceptions because the injury results from nonperformance of an absolute duty of Midland Oil Company. We need not inquire whether the common law imposes upon a landholder an absolute duty to prevent pollution of a stream to the injury of a user thereof. Here, there is a positive duty enjoined to prevent such pollution. The Departmental Regulations (above cited) positively require this. Paragraph 45, as amended, is:

"Lessee shall provide two properly prepared slush pits, into one of which he must deposit sand pumpings and other materials extracted from the well during the process of drilling, but such material as is suitable for the mudding of a well shall be run into the other pit. The construction of such pits shall be subject to the approval of the inspector. Sand pumpings and such materials shall not be allowed to run over the surface of the land."

Paragraph 61, as amended, is:

"All B–S and salt water from tanks or wells shall be drawn off into proper receptacles to hold and retain same without permitting it to run over the surface of the land or into the creeks and ravines and where earthen tanks or sump holes are used, they shall not be located in any draw or ravine, but must be located in places and be so constructed that water from rains will not flow into them and wash out the B–S or destroy the dams, and in cases where the B–S is not run through some treating process, same shall when in sufficient quantities be burned at least once every week and at more frequent intervals when possible.

"Where it is impossible to burn the B–S, or where it is necessary to pump salt water in such quantities as would damage the surface of the leased land or adjoining property, or pollute any fresh water, the lessee shall notify the superintendent, who shall give instructions in each instance as to the disposition of such B–S or salt water."

Further, the solicitude of the department to protect pure water from contamination from oil wells is shown in paragraphs 43, 46 and 58. In paragraph 43 no oil well can be located within 200 feet of any "established watering place" without express permission. Paragraph 46 required "measures to prevent the contamination or pollution of any fresh water supply encountered in any well drilled for oil or gas." Paragraph 58 requires protection of fresh water

found in "any dry or abandoned well." These regulations are in pursuance of the statute (34 Stat. 539, § 3) and have the force of statutory requirements. They not only attach to the relation established by the lease to the Midland Oil Company but they are specifically included in that contract. All of these requirements are placed upon the *lessee*. The lessee is the only one having contractual or legal contact with the Osage Nation (owner of the land) or with the government, which is supervising the making, terms and enforcement of such leases. It is the lessee which is alone specifically named in the regulations; which is alone obligated by contract and which is alone bound by a bond for the benefit of the owner. The very evident intent and arrangement is to look to the lessee and the lessee alone for the full performance of the lease. The regulations permit sub-leases and assignments or transfers of leases (Regulations, No. 21), but such are invalid unless approved by the department and unless such sublessee, transferee or assignee shall furnish with his conveyance the same kind of bond as required of the original lessee; and "any attempt to sublease, transfer or assign an approved lease or any interest therein without the consent and approval of the Secretary of the Interior shall be absolutely void and shall subject the original lease to cancellation in the discretion of such Secretary" (Regulations, No. 21). The Regulations (paragraphs 38–67, inclusive) minutely define the duties of the "lessee" as to operation under the lease. All of such regulations (paragraphs 38–67) would be vain unless the lessee were to be held responsible no matter who did the actual work. That the word "lessee" (repeatedly used in these Regulations respecting operation) was not loosely used is evident from the circumstance that the Regulations had in mind that the actual work of drilling might be done by contract and not by the lessee direct. The first paragraph (38) under the heading "Duties of Lessees" provides for resident agents of the lessee upon whom notice may be served. This action provides that, in case of the incapacity or absence of the designated agent or substitute, "any employé of the lessee upon the leased premises, *or the contractor or other person in charge of* drilling or related operations thereon" shall be considered as the agent and service upon "any such employee, *contractor or other person* shall be deemed service upon the lessee."

From the preceding considerations, it

would seem that the lessee was absolutely bound to the performance of those things required by the lease or by the Regulations to which the lease was expressly subject. As paragraphs 45 and 61 (above quoted) required the prevention of the very thing which occasioned the injury complained of here, those duties were such as could not be delegated by the lessee with release of liability.

"Under some circumstances duties are imposed upon one which he cannot delegate to another, and where this is the case he is liable for their non-performance though he employs an independent contractor to perform the actual work. Thus if a statute or municipal ordinance requires a person to take a certain precaution when work is being done and such precaution is not taken, it is no defense that a contractor was employed to do the work and that the failure to take the precaution was due to the contractor's negligence. Likewise, if one contracts to do a certain thing, he cannot excuse his failure by saying that he employed another to do it." 14 R. C. L. 98.

The numerous citations for the above-quoted text abundantly support it. In the present case, the duty was both enjoined by regulations (with the legal force of statutes) and assumed as obligations in the contract of lease.

I conclude, therefore, that the trial court was right in charging that the defense of independent contractor was not open to the lessee, Midland Oil Company.

The next contention is that, even though the defense of independent contractor is not open to the company, yet the use of Osage lands under grazing leases (such as held by plaintiffs) was subordinate to the use of the same land under mineral leases, and, therefore, any injury naturally resulting to the former because of the operation of the latter in the usual, careful way would be without recourse. There is, in my judgment, no basis whatsoever for such position. No statute, departmental regulation nor course of dealing suggests such view. It would certainly require some affirmative showing to establish such an unusual and exceptional proposition.

This leaves for determination the question whether there was an absolute liability for this injury. Obviously, the injury was the result of violation of a positive duty enjoined by the Oklahoma statute (quoted in the majority opinion). I think the judgment below was right and should be .

Affirmed.