**ROSKAM BAKING COMPANY,**
Plaintiff/Counter–
Defendant,

v.

**LANHAM MACHINERY COMPANY, INC., APV Consolidated, Inc., APV Baker Company, Inc., Defendants/Counter–Plaintiffs.**

No. 1:97–CV–213.

United States District Court,
W.D. Michigan,
Southern Division.

July 15, 1999.

Miles J. Murphy, III, Flickinger & Plachta, PC, Grand Rapids, MI, Michael J. Izzo, Jr., Robert M. Caplan, Cozen & O'Connor, Philadelphia, PA, Richard E. Holmes, Jr., Garan, Lucow, Miller & Seward, PC, Grand Rapids, MI, for Roskam Baking Company, plaintiff.

Frederick D. Dilley, Boyden, Timmons, Dilley & Haney, Grand Rapids, Mi, for mediator.

## OPINION

QUIST, District Judge.

Plaintiff, Roskam Baking Company ("Roskam"), has sued Defendants, Lanham Machinery Company, Inc., APV Consolidated, Inc., and APV Baker Company, Inc. (collectively "APV" or "Defendants"), alleging breach of contract and negligence. This Court has diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332. This matter is before the Court on Defendants' Motion for Summary Judgment re Breach of Contract and Negligence, Defendants' Motion for Summary Judgment re Consequential Damages, and Defendants' Motion for Summary Judgment re Spoliation of Evidence.

### Facts

**A. Purchase and installation of the oven**

On July 21, 1987, Roskam entered into a written contract with APV for the purchase of an oven for its Butterworth commercial baking facility in Grand Rapids, Michigan, to replace an older model APV oven at the facility. (See 7/15/87 Proposal, Defs.' Br.Supp.Mot.Summ.J. re Breach of Contract & Negligence Ex. A (hereinafter the "Oven Contract").) The oven was a large "continuous feed" oven designed to produce approximately 15,000 pounds of bread per hour and was designed to operate at approximately 500F. The bread was fed into the oven on a conveyor which entered through a 42 inch opening at the

top front of the oven, which was covered on three sides by a stainless steel draft hood. The bread was fed through the oven on the conveyor and, after baking, exited a similar opening at the bottom of the oven. The new oven was 18 inches taller than the older model, but otherwise had the same dimensions and was installed at the same place in the plant. (9/23/98 Bledsoe Dep. at 132, 134, Pl.'s Resp. Mot.Summ.J. re Breach of Contract & Negligence Ex. A.)

The parties disagree about whether Roskam or APV was responsible for the installation of the new oven, particularly as installation related to the distance between the top of the oven and the ceiling at the Butterworth facility. The Oven Contract provides that Roskam would pay APV $36,204.00 for APV to supervise installation of the oven, but that Roskam was not paying for APV to provide labor, electrical wiring, plumbing, or freight in regards to installation. (*See* Oven Contract at 3.) The contract goes on to state that "Oven Installation requires beam and or truss modifications in oven area to allow for an additional 18″ HT. in oven enclosure and adequate clearances for ductwork and blowers." (*Id.*) A handwritten note next to this provision reads "In-house change—Roskam." (*Id.*) This section also provides that "[a]ll relocation of existing equipment and or building modifications are not included and will be by [Roskam]." (*Id.*)

A separate section of the contract, entitled "Work by Buyer," provides that "[a]ll necessary openings or building alterations or modifications and relocation of equipment as required are by Buyer." (*Id.* at 6, ¶ 2.) This section also states that "[i]t is the Buyer's responsibility to comply with insurance and local safety codes pertaining to building construction, fire, electrical, and steam requirements." (*Id.* ¶ 5.) Finally, this section states that "[APV] is not responsible for installation or supervision of any of the above." (*Id.* ¶ 9.)

Finally, the Oven Contract states that APV's liability is limited to repair or replacement of the oven in a case of a defect occurring within the first 2,000 operating hours or the first year from the date of shipment, whichever comes first. (*See id.* at 7.) The contract also states that APV assumes no "responsibility for the loss of time, downtime, products or equipment damage occasioned by failure of the equipment, whatever the cause." (*Id.*)

Garry Bledsoe, one of the APV employees involved in supervising the installation of the oven, discussed with Roskam personnel whether the cross members that connected the ceiling trusses could be raised or removed, as required in the Oven Contract, such that the new oven, which was 18 inches taller than the older model, could be placed in the same location. (*See* 9/23/98 Bledsoe Dep. at 131; 5/7/98 Bledsoe Dep. at 33, Pl.'s Resp. to Mot. Summ J. re Breach of Contract & Negligence Ex. B.) Although Bledsoe thought that the oven could have been installed in a different area where the trusses were already removed, he did not suggest to Roskam the possibility of installing the oven in a different location, as the existing location already had a conveyor and a concrete pad to use as a foundation for the oven and Roskam requested that the new oven be installed in the same area. (*See* 9/23/98 Bledsoe Dep. at 133–34.) The trusses were then removed by Roskam. (*See* 5/7/98 Bledsoe Dep. at 58.)

APV also decided that the draft hood, which extended 26 inches above the top of the oven, would be attached to the wood roof by either metal chains or threaded metal rods. (*See* Black Dep. at 59–61, Pl.'s Resp. to Mot.Summ.J. re Breach of Contract & Negligence Ex. C.) APV was aware at the time it installed the oven of the possibility that hot air could come out of the top of the oven during operation due to a phenomenon called "chimney effect." (*See* Stephen Smith Dep. at 25–29, Pl.'s Resp. to Mot.Summ.J. re Breach of Contract & Negligence Ex. H.) However,

Bledsoe testified that he was only concerned about the clearance of the oven concerning the cross structures between the trusses, and that the issue of the clearance between the top of the oven and the ceiling "was not a relevant factor there." (5/7/98 Bledsoe Dep. at 58.) Bledsoe testified that the modifications that Roskam made in accordance with APV's suggestions were satisfactorily completed. (*See* 5/7/98 Bledsoe Dep. at 111.)

## B. OSHA inspection

On September 3, 1994, pursuant to a separate written agreement between APV and Roskam, APV conducted an OSHA inspection of the oven. (*See* 9/3/94 OSHA Inspection Procedure, Defs.' Br.Supp.Mot. Summ J. re Breach of Contract & Negligence Ex. F (hereinafter the "OSHA Inspection Contract").) The OSHA Inspection Contract states that the inspection was to be conducted pursuant to OSHA regulations, under which "APV has undertaken to inspect all safety devices on the Equipment." (*Id.* at ¶ 2.) The OSHA Inspection Contract defines "safety device" as a feature designed to shut down part or all of the equipment "due to a dangerous condition of an abnormal function in the equipment." (*Id.*) The OSHA Inspection Contract also states that:

APV has not undertaken to advise customer as to other safety features, safeguards ir procedures which might be utilized by Customer to improve the safety features or other characteristics of the Equipment, and Customer has not requested that APV do so. Therefore APV does not warrant or represent that the Equipment is "safe" or employs all safety features which are necessary or desirable in equipment of this type.

(*Id.*) The OSHA Inspection Contract also excludes any implied warranty and purports to limit APV's liability to return of the contract price for conducting the inspection. (*See id.* ¶¶ 3–4.) Finally, the OSHA Inspection Contract concludes by stating that "the terms and conditions stat-ed herein is [sic] a complete and exclusive statement of the undertaking of APV. . . ." (*Id.* ¶ 5.)

The APV inspection report attached to the OSHA Inspection Contract concluded that several items in the inspection were not satisfactory, such as control of the purge timer and damper and operation of the warning alarms. (*See id.*) The inspection checklist does not indicate that the issue of clearance between the draft hood and ceiling was considered or reviewed during the inspection. The APV employee who conducted the inspection spoke with Roskam's maintenance supervisor about the findings of the inspection, and the supervisor signed off on the report. (*See* Krupiczewicz Dep. at 61–62, Defs.' Br.Supp.Mot.Summ.J. re Breach of Contract & Negligence Ex. G.) Roskam has admitted that it was its responsibility to correct non-satisfactory items identified in the report, and the items identified in the report were brought to the attention of the proper Roskam employees. (*See id.* at 61, 83.)

Roskam also alleges that OSHA inspections of the oven were also conducted by APV, pursuant to a written agreement, in June and December of 1995. (*See* Compl. ¶ 16.) APV admitted at oral argument that the oven was also inspected in 1995 pursuant to a written agreement identical to the 1994 OSHA inspection agreement.

## C. The fire

On March 1, 1996, a large fire occurred at the Butterworth facility. How the fire was started is a matter of substantial dispute. Roskam asserts that the fire was caused because the oven was installed too close to the ceiling at the plant, causing the wooden roof rafters directly above the draft hood to catch fire. Two Roskam employees have testified that they saw the fire on the ceiling right above the draft hood. (*See* Vachon Dep. at 133–35, Pl.'s Resp.Mot.Summ.J. re Breach of Contract & Negligence Ex. E; Andrew Smith Dep. at 43–45, Pl.'s Resp.Mot.Summ.J. re Spoli-

ation of Evidence Ex. B.) One of Roskam's experts, Harold Greve, concluded that there was a distance of 11 ⅝ inches from the top of the draft hood to the closest rafter. (*See* Greve Report at 5, Pl.'s Resp. Mot.Summ.J. re Breach of Contract & Negligence Ex. D.) Another of Roskam's experts, Carlos Fernandez–Pello, concluded that the proximity of the draft hood to the rafters and the method of supporting the hood to the rafters using steel rods or chains caused the roof to become heated and ignite the day of the fire. (*See* Pello Report at 5, Pl.'s Resp.Mot.Summ.J. re Breach of Contract & Negligence Ex. M.) Another Roskam expert, Donald Hoffman, also indicated that "[t]he fire was caused by the [ ] oven being installed too close to the combustible wood ceiling in the Roskam facility." (*See* Hoffman Report at § IV.3, Defs.' Br. Supp.Mot.Summ.J. re Breach of Contract & Negligence Ex. N.) Finally, the Grand Rapids Fire Inspector, Pablo Martinez, investigated the cause and origin of the fire and testified that due to prolonged exposure to the oven's operating temperature, the wooden ceiling dried out and deteriorated to the point of ignition from the normal operation of the oven. (Martinez Dep. at 59, Pl.'s Resp. Mot.Summ.J. re Spoliation of Evidence Ex. C.)

APV responds that it is impossible to tell how the fire started because Roskam razed the facility on April 4, 1996, before APV was given the opportunity to examine the fire scene. Larry West, the fire scene investigator for The Maryland Insurance Group ("Maryland"), Roskam's insurer and subrogee in this action, was notified of the fire the evening of March 1, 1996, and came to Grand Rapids to investigate. (*See* West Dep. at 73, Defs.' Attachs. Supp. Mot.Summ.J. re Spoliation of Evidence Ex. B.) Upon learning of the fire, West called Maryland/Roskam's counsel's law firm as well as Hoffman. (*See id.* at 73–74.) Hoffman arrived on the scene the afternoon of March 2, 1996, and Michael Izzo, counsel for Maryland/Roskam in this case, arrived on the scene March 4, 1996. (*See id.* at 76.)

West incorrectly believed that by approximately March 6, 1996, Izzo had contacted APV. (*See id.* at 133). Hoffman testified that he discussed with West whether APV should be contacted, and that "West had indicated that he had communicated to somebody that they should notify the oven manufacturer, and I agreed with him." (Hoffman Dep. at 173, Defs.' Attachs. Supp.Mot.Summ.J. re Spoliation of Evidence Ex. E.) Martinez also has testified that, in hindsight, someone from APV should have been at the scene because APV could "better explain the operation of the oven for us." (Martinez Dep. at 237, Defs.' Reply Mot.Summ.J. re Spoliation of Evidence Ex. 4.)

Gary Bledsoe of APV learned about the fire while in Chicago, and Bledsoe visited the Butterworth facility on March 7, 1996, in connection with Roskam's request for a price to replace its oven and related equipment. (5/7/98 Bledsoe Dep. at 73, Defs.' Reply Mot.Summ.J. re Spoliation of Evidence Ex. 26.) Bledsoe testified that he was told by Roskam during his visit that the fire "started in the area of the oven." (9/23/98 Bledsoe Dep. at 315, Defs.' Reply Mot.Summ.J. re Spoliation of Evidence Ex. 27.) Bledsoe relayed that information to APV's home office. (*See id.* at 315–16.) However, APV states that it did not learn that the oven was in fact a suspected cause of the fire until June 17, 1996, when it received a demand for reimbursement of workers compensation payments made as the result of Jacqueline Medina, a Roskam employee, dying in the fire. At this time, APV demanded that the fire scene be preserved for inspection by APV. (*See* 6/17/96 Letter from Martin to Villarreal, Defs.' Attachs. Supp.Mot.Summ.J. re Spoliation of Evidence Ex. M.) By that time, however, the fire scene had been razed.

APV's expert, John Mertens, has testified that he has been unable to conduct a complete investigation because "the evidence that I would like to look at is not

there." (Mertens Dep. at 36, Defs.' Attachs. Supp.Mot.Summ.J. re Spoliation of Evidence Ex. I.) Roskam asserts that it preserved all of the relevant evidence not destroyed in the fire. However, Mertens has testified that at least four specific items, which he believes are relevant, were not preserved: 1) missing hydraulic components of the conveyor drive from the area where the fire was observed; 2) a missing lamp socket from the immediate area where the fire was observed; 3) missing duct work from the immediate area where the fire was observed; and 4) inadequately documented electrical conduit. (*See id.* at 36–38.)

*Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *See Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *See id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *See id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *See id.* at 251, 106 S.Ct. at 2511 (citing *Schuylkill and Dauphin Imp Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). The summary judgment standard mirrors the standard for a directed verdict. *See id.* at 250, 106 S.Ct. at 2511. The only difference between the two is procedural. *See id.* Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. *See id.*

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; see also Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir. 1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

*Analysis*

**I. Breach of contract**

In its Complaint, Roskam alleges that, "[p]ursuant to written agreement, [APV] inspected the oven in June and December 1995, to assure, among other things, that the ovens' [sic] installation and maintenance were proper and in compliance with OSHA standards." (Compl.¶ 16.) Roskam further claims that APV "breached that written agreement in that the installation of the oven was not proper and/or in compliance with OSHA standards and defendant failed to detect and/or notify plaintiff of same." (*Id.* ¶ 17.)

Under the OSHA Inspection Contract, APV agreed "to inspect all safety devices on the Equipment." (9/3/94 OSHA Inspection Procedure at ¶ 2.) A safety device is defined under the agreement as a feature designed to shut down part or all of the equipment "due to a dangerous condition of an abnormal function in the Equipment." (*Id.*) Most significantly, the agreement states that "APV has not undertaken

to advise [Roskam] as to other safety features, safeguards, or procedures which might be utilized by [Roskam] to improve the safety features ... of the Equipment.... Therefore, APV does not warrant or represent that the Equipment is 'safe' or employs all safety features which are necessary or desirable in equipment of this type." (*Id.*) The agreement also explicitly states that the contract "is a complete and exclusive statement of the undertaking of APV ...." (*Id.* ¶ 5.)

The language of the OSHA Inspection Contract clearly and unambiguously limits the scope of the inspection to safety devices on the oven. The checklist attached to the contract confirms that only safety devices that would shut down the oven in case of emergency were intended to be part of the inspection. (*See id.* at 2–5.) Nowhere does the contract suggest that APV is to inspect the safety of the installation of the oven as it relates to the proximity of the oven to the wooden ceiling. Roskam does not specifically identify any language in the inspection contract as being ambiguous as to whether the inspection was to examine the safety of the installation of the oven as it related to the proximity of the oven to the wooden ceiling. Roskam also does not allege that APV made any oral statement during the OSHA inspection that it was examining the safety of the original installation of the oven as it related to the proximity of the oven to the wooden ceiling. In fact, Roskam's chief operating officer, Greg Hooks, admitted that the OSHA Inspection contract was not ambiguous and that the scope of the inspection was limited to safety devices on the oven. (Hooks Dep. at 100–103, Def.'s Br. Supp.Mot.Summ.J. re Consequential Damages Ex. E.) Therefore, the Court concludes that, as a matter of law, APV did not breach the OSHA Inspection Agreement.

■ Judge Soet of the Kent County Circuit Court reached a similar conclusion in *Trafford Park Insurance, Ltd., v. Roskam Baking Co.*, Case No. 96–03883–NZ (Mich.

Cir.Ct. Jan. 28, 1999), a related case in which Roskam and APV litigated this exact issue. Judge Soet granted summary judgment in favor of APV on this issue, holding that the provisions of the OSHA inspection agreement of September 3, 1994, were "clear and unambiguous" and concluding that "APV/Lanham had no duty under the terms of it to make an inspection of Cross–Plaintiff Roskam's building for purposes of fire safety nor an inspection of the building to evaluate its relationship to the oven." *Trafford Park*, slip op. at 7, 9 (attached to Defs.' Br. Supp.Mot. Summ.J. re Breach of Contract & Negligence Ex. O). Neither party argues that Judge Soet's opinion precludes the parties from re-arguing this issue before this Court, as a final judgment has not been entered in the *Trafford Park* case. However, because the issue was litigated by the same parties and was actually and necessarily decided by Judge Soet, the state court proceeding would collaterally estop Roskam from arguing this issue except for the fact that a final judgment has not yet been entered in the case. *See Lichon v. American Universal Ins. Co.*, 435 Mich. 408, 428, 459 N.W.2d 288, 298 (1990). Therefore, Judge Soet's opinion is entitled to some deference by this Court. Additionally, the Court, on its own analysis, agrees with Judge Soet's conclusion that APV did not breach its OSHA Inspection Agreement with Roskam. Therefore, summary judgment on the breach of contract claim will be entered in favor of APV.

## II. Negligence

### A. Installation of the oven

#### 1. Legal sufficiency of negligence claim

■ APV's initial argument is that Roskam's negligence claim concerning the installation of the oven is merely an action for negligent performance of contract, a cause of action not recognized under Michigan law. The parties agree that Michigan

law governs Roskam's negligence claim.[1] Under Michigan law, a legal duty to use reasonable care may arise out of a contractual relationship. *See Crews v. General Motors Corp.*, 400 Mich. 208, 225, 253 N.W.2d 617, 622 (1977) (holding that "a duty underlying an action in tort may arise out of a contractual relationship"); *see also Clark v. Dalman*, 379 Mich. 251, 261, 150 N.W.2d 755, 760 (1967) (en banc) (noting that a "duty of care ... frequently does arise out of a contractual relationship"). "However, a tort action will not lie when based *solely* on nonperformance of a contractual duty." *Crews*, 400 Mich. at 226, 253 N.W.2d at 623 (emphasis in original). Only if there is some " 'active negligence or misfeasance ... distinct from breach of contract' " will the plaintiff will be able to support a negligence claim. *Hart v. Ludwig*, 347 Mich. 559, 563, 79 N.W.2d 895, 897 (1956) (en banc) (quoting *Turtle v. Gilbert Mfg. Co.*, 145 Mass. 169, 174, 13 N.E. 465, 467 (1887)). Or, as explained by Professors Prosser and Keaton, "[m]isfeasance or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability ... [whereas] [t]here is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made." W. Page Keeton, et al., *Prosser & Keeton on The Law of Torts* § 92 at 656–57 (5th ed.1984) (italics deleted).

The Michigan Court of Appeals also explained the significance of the distinction between misfeasance and nonfeasance in *Courtright v. Design Irrigation, Inc.*, 210 Mich.App. 528, 534 N.W.2d 181 (1995):

Michigan law distinguishes between misfeasance and nonfeasance. Misfeasance is negligence during performance of a contract. While performing a contract, a party owes a separate, general duty to perform with due care so as not to injure another. Breach of this duty may give rise to tort liability.... In contrast, failure to perform a contract altogether constitutes nonfeasance and gives rise only to a suit for breach of contract.

*Courtright*, 210 Mich.App. at 530, 534 N.W.2d at 182. The Sixth Circuit has acknowledged that *Courtright* properly explains Michigan law on this issue. *See Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 n. 1 (6th Cir.1995).

In this case, Roskam has alleged more than a mere failure to perform a contract provision, such as a failure to install the oven. Rather, Roskam alleges misfeasance, a failure by APV to exercise reasonable care in performing its obligation, namely being negligent in its supervision of the installation of the oven. In an analogous situation involving a lawsuit by a manufacturer for lost production arising out of the negligent installation of a grinder pursuant to a contract for the sale and installation of the grinder, the Michigan Court of Appeals held that, because the plaintiff alleged misfeasance, the plaintiff could state a cause of action for negligence as well as breach of contract. *See Challenge Mach. Co. v. Mattison Mach. Works*, 138 Mich.App. 15, 27, 359 N.W.2d 232, 237–38 (1984) (per curiam). Accordingly, the Court concludes that Roskam may assert a negligence cause of action against APV if APV is found to have undertaken supervision of installation of the oven as it related to proximity to the wooden ceiling. The Court must therefore look to the Oven Contract to determine whether APV did in fact undertake supervision of installation of the oven as it related to the oven's proximity to the wooden ceiling. *See*

---

1. A choice of law provision in the Oven Contract provides that Georgia law governs interpretation of the contract. However, Roskam is asserting a tort, negligent supervision of the installation of the oven, which took place entirely within the state of Michigan. Therefore, Michigan's interests mandate that Michigan law be applied to Roskam's negligence claim. *See Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286, 562 N.W.2d 466, 471 (1997).

*Clark,* 379 Mich. at 261–62, 150 N.W.2d at 760–61.

## 2. Scope of APV's duty to supervise installation

APV argues that, under the clear and unambiguous terms of the Oven Contract, APV cannot be held liable to Roskam for negligence because it owed no duty under the Oven Contract to Roskam concerning installation of the oven as it related to the oven's proximity to the ceiling. Roskam responds that the Oven Contract is ambiguous as to whether APV had such a duty and, therefore, there is a genuine issue of material fact as to whether APV had any duty to Roskam to use reasonable care in installing the oven as it related to clearance from the ceiling.

■ The parties agree that interpretation of the Oven Contract is governed by Georgia law, in accordance with a choice of law provision in the Oven Contract. A contract is ambiguous under Georgia law if it is subject to two or more reasonable interpretations. *See Archer v. Carson,* 213 Ga.App. 161, 163–64, 444 S.E.2d 82, 85 (1994). Whether the contract is ambiguous is a question of law. *See id.* at 163, 444 S.E.2d at 84. "It is only after the court finds an ambiguity and unsuccessfully attempts to resolve the ambiguity through application of the rules of contract construction that a question of fact exists." *Id.* (citation omitted); *see also Altama Delta Corp. v. Howell,* 225 Ga.App. 78, 79, 483 S.E.2d 127, 129 (1997).

■ The Oven Contract does not define what constitutes "installation" or "supervision" of installation. The Court concludes that, in the absence of language in the contract to the contrary, there is a genuine issue of material fact as to whether APV's "installation" of the oven includes an undertaking to use reasonable care in installation of the oven as it relates to the oven's proximity to the wooden ceiling.

However, APV argues that other provisions in the contract indicate that "installation" was not meant to include consideration of how installation of the oven related to the oven's proximity to the wooden ceiling at Roskam's plant. APV argues that under the heading "Oven Installation," the Oven Contract specifically addressed the issue of oven clearance underneath the ceiling, providing that "Oven Installation requires beam and or truss modifications in oven area to allow for an additional 18″. HT. in oven enclosure and adequate clearances for ductwork and blowers." (Oven Contract at 3.) Handwritten next to this provision in the notation "In-house change—Roskam." (*Id.*) Roskam disputes that any of its employees wrote "In-house change—Roskam" next to the provision requiring truss modifications, but another section of the contract specifically states that "[a]ll necessary opening or building alterations or modifications and relocation of equipment as required are by Buyer." (*Id.* at 6, ¶ 2.)

However, there is a genuine issue of material fact as to whether this provision indicates that Roskam is responsible for the proximity of the oven to the roof as it related to fire safety. On its face, the provision does not concern the amount of space between the oven and the roof. Bledsoe testified that this provision was added because the new oven was 18 inches taller than the old oven and would not fit in the same location without removing cross members of the trusses. (*See* 9/23/98 Bledsoe Dep. at 131.) Bledsoe also testified that he was only concerned about the clearance of the oven concerning the cross structures between the trusses, and that the issue of the clearance between the top of the oven and the ceiling "was not a relevant factor there." (5/7/98 Bledsoe Dep. at 58.) Accordingly, the Court concludes that there is a genuine issue of material fact as to whether this provision excludes from APV's contractual undertaking in supervising the installation of the oven a consideration of whether the oven was installed too close to the wooden roof.

746

APV also notes that the contract provides that "[i]t is the Buyer's responsibility to comply with insurance and local safety codes pertaining to building construction, fire, electrical, and steam requirements" and that "[APV] is not responsible for installation or supervision of any of the above." (*Id.* at 6, ¶¶ 6, 9.) APV argues that the oven's proximity to the wooden ceiling is an issue of "local safety codes pertaining to building construction [or] fire ... requirements" for which APV is not responsible.

While this is one reasonable interpretation of the Oven Contract, it would also be reasonable for a jury to find that whether the oven was installed too close to the wooden ceiling is not solely an issue of compliance with building construction code or fire code requirements. APV has presented no evidence that the proximity of the oven to the wooden ceiling is specifically governed by the building construction code or the fire code. In fact, to the extent any building code applies to the proximity of the oven to the wooden ceiling, Hoffman, one of Plaintiffs' experts, testified that the Grand Rapids BOCA mechanical code provides that Roskam would satisfy any obligation it had under the Oven Agreement to meet local building construction and fire safety codes by "[r]ely[ing] on the manufacturer during the installation...." (*See* Hoffman Dep. at 141, Pl.'s Resp. to Mot.Summ.J. re Breach of Contract & Negligence Ex. L.) In other words, Roskam had to rely on APV, the manufacturer of the oven, concerning how much clearance was necessary between the oven and the wooden ceiling because "[t]hat's the only way to know" how much clearance is necessary, as the manufacturer is the party with knowledge about the heat output of the oven and the amount of clearance necessary. (*Id.*)

Judge Soet reached a different conclusion on this issue in *Trafford Park*, granting summary judgment in favor of APV and holding that the provisions of the Oven Contract were "clear and unambiguous." Judge Soet concluded that:

APV was responsible solely for supervising the erection and installation of the oven in such a way that it would properly operate and perform its necessary functions. They were not responsible for alterations in the building or compliance with fire or other safety requirements. Such considerations were the sole responsibility of Cross–Plaintiff Roskam. In fact, the oven was apparently correctly installed as it operated without any deficiencies or complaints from Roskam for nine years. If the oven as installed created a problem by an improper juxtaposition with the wooden ceiling as is allege by Roskam it was the duty of Roskam to discover this violation of safety and fire standards and correct it.

*Trafford Park*, slip op. at 6–7, 9. This Court respectfully disagrees that the Oven Contract was clear and unambiguous and that APV's undertaking to supervise installation only required APV to make sure the oven "would properly operate and perform its necessary functions." *Id.* at 6. The Court believes that a reasonable juror *could* find that in undertaking to supervise installation of the oven, APV had a duty to consider whether the oven was being installed safely, specifically, whether the oven was installed too close to the wooden ceiling. While APV was clearly not responsible under the Oven Contract for making any necessary building modifications at Roskam's plant, APV may have had a duty in supervising installation of the oven to warn Roskam that the proximity of the oven to the wooden ceiling was a fire hazard and that Roskam should undertake building modifications to allow for the safe operation of the oven. As the manufacturer of the oven, APV was the party best suited to consider whether the oven was installed a safe distance from the wooden ceiling. In fact, there is some evidence in the record that APV was aware at the time it installed the oven of the possibility that hot air could come out

of the top of the oven during operation due to a phenomenon called "chimney effect." (*See* Stephen Smith Dep. at 25–29.) Accordingly, the Court concludes that a genuine issue of material fact exists on this issue, such that summary judgment will be denied.

### B. OSHA inspection of the oven

■ Roskam also alleges that APV failed to exercise reasonable care during the OSHA inspection of the oven. However, the Court has already granted summary judgment on Roskam's breach of contract claim concerning the OSHA inspection, concluding that APV's duties concerning the OSHA inspection of the oven were specifically limited by contract to inspection of the safety devices on the oven. Accordingly, the Court concludes that APV had no duty of care during OSHA inspection of the oven to examine the proximity of the oven to the wooden ceiling or fire safety in general. Therefore, summary judgment on Roskam's negligence claim concerning the OSHA inspection of the oven must be granted in favor of APV.

### C. Economic loss doctrine

■ APV also argues that Roskam's negligence claim is barred by the economic loss doctrine. The Michigan Supreme Court, in adopting the economic loss doctrine, explained that " '[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic losses." ' " *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 520, 486 N.W.2d 612, 615 (1992) (quoting *Kershaw County Bd. of Educ. v. U.S. Gypsum Co.*, 302 S.C. 390, 393, 396 S.E.2d 369 (1990)) (alteration in original); *see also Masb–Seg Property/Casualty Pool v. Metalux*, 231 Mich.App. 393, 401, 586 N.W.2d 549, 553 (1998) (stating that "[t]he economic loss doctrine provides that where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC"). APV argues that the economic loss doctrine bars Roskam's claim because: (1) APV and Roskam are sophisticated commercial entities; (2) the risk involved here was in the contemplation of the parties; and (3) the contract is for the sale of goods and is therefore governed by the UCC, which provides a remedy in this case.

The problem with APV's argument is that the damages in this case were not the result of a product defect, as there is no indication that a defect in the oven itself caused the damages at issue in this case. As such, this is not a case where Roskam' s " 'expectations in a sale [were] frustrated because the product [it] bought [did] not work[ ] properly,' " such that the Economic Loss Doctrine would apply. *Neibarger*, 439 Mich. at 520, 486 N.W.2d at 615 (quoting *Kershaw County* ). In other words, this is not a case where Roskam "seeks to recover for economic loss caused by a defective product purchased for commercial purposes," as there is no allegation that the oven was defective. *MASB–SEG Property/Casualty Pool*, 231 Mich.App. at 401, 586 N.W.2d at 553. Judge Soet reached a similar conclusion when facing this issue in *Trafford Park*, holding that:

> the economic loss doctrine does not apply to Roskam's negligence claim because its claim neither asserts any malfunction of the purchased ovens nor attempts to recover any damages for destruction of the ovens. Roskam does not assert that the Lanham/APV ovens malfunctioned or did anything or operated in any way other than the exact way that they were intended to and were expected to operate. Rather, it asserts that the ovens were installed too close to the roof which over time caused the roof to ignite. Thus, it does not assert any defect in the design, manufacture or operation of the goods purchased. Such a claim is central to imposition of the economic loss doctrine.

*Trafford Park*, slip op. at 4. Accordingly, the Court concludes that the economic loss doctrine does not apply in this case.[2]

## II. Consequential damages

■■■ APV points to provisions in the Oven Contract and OSHA Inspection Contract to argue that, should APV be found liable for breach of contract or negligence, Roskam cannot obtain incidental and consequential damages. The Oven Contract states that the oven is warranted "to be free from defects in material and workmanship" for one year and that APV's "entire liability is limited to repair or replacement ... [of] any part ... that in the judgment of [APV] was defective at the time of shipment...." (Oven Contract at 7.) The Oven Contract also provides that repair or replacement "is in lieu of all warranties express or implied and [APV] in no event is liable for loss, damage or delays caused by defective material or workmanship." (*Id.*) Finally, the Oven Contract provides that APV assumes no "responsibility for the loss of time, downtime, products or equipment damage occasioned by failure of the equipment, whatever the cause." (*Id.*) The OSHA Inspection Contract includes similar language, limiting APV's liability under the inspection to "return of the contract price for conducting the inspection" and excluding incidental or consequential damages "arising out of any facilities or malfunction of the equipment, unless caused solely by APV's negligence in performing its obligations under this Agreement." (OSHA Inspection Contract at ¶ 4.)

These provisions do not apply to this case, however, because Roskam is not alleging damages resulting from "defective material or workmanship," "failure of the equipment," or "malfunction of the equipment." Roskam does not allege that the oven was defective, but rather that it was installed improperly. The contractual clauses cited by APV do not purport to limit APV's liability for damages resulting from improper installation of the oven that do not result from a defect, malfunction, or failure of the oven. *See Frick Forest Prods., Inc. v. International Hardwoods, Inc.*, 161 Ga.App. 359, 360, 288 S.E.2d 625, 626 (1982) (noting that a limitation on consequential damages "would not necessarily bar an action for consequential damages based on allegations of negligence in installing or repairing the equipment"); *Appling Motors, Inc. v. Todd*, 143 Ga.App. 644, 644, 239 S.E.2d 537, 538 (1977) (holding that contract clause barring consequential damages applied only to losses occasioned by product defects, not to damages caused by negligence in the installation of the product). Accordingly, summary judgment on the issue of incidental and consequential damages will be denied.

## III. Spoliation of evidence

■■■ APV finally argues that summary judgment is appropriate in this case as a sanction against Roskam's destruction of critical evidence, namely the razing of the fire scene prior to the time APV was notified that it was potentially responsible for the fire. Roskam responds that its failure to notify APV was accidental and did not unduly prejudice APV.

■■■ The Sixth Circuit has held that "[t]he rules that apply to the spoiling of evidence and the range of appropriate sanctions are defined by state law," in this case, Michigan. *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir.1999); *see also Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1988). Under Michigan law, "[a] trial court has the authority, derived from its inherent powers, to sanction a party for failing to preserve evidence that it knows or should know is relevant before litigation is commenced." *MASB–SEG*, 231 Mich.

---

**2.** Therefore, the Court need not consider Plaintiff's second argument, that the Economic Loss Doctrine does not apply because the installation contract was a separate contract for services rather than goods.

App. at 400, 586 N.W.2d at 553; *see also Brenner v. Kolk*, 226 Mich.App. 149, 159–60, 573 N.W.2d 65, 70 (1997) (same). A sanction may be appropriate "regardless of whether the evidence is lost as the result of a deliberate act or simple negligence, [as] the other party is unfairly prejudiced because it is unable to challenge or respond to the evidence...." *Brenner*, 226 Mich.App. at 160, 573 N.W.2d at 70. The imposition of a sanction for spoliation of evidence is a matter within the discretion of the trial judge. *See MASB–SEG*, 231 Mich.App. at 400, 586 N.W.2d at 553; *Brenner*, 226 Mich.App. at 160, 573 N.W.2d at 70.

██ However, "[d]ismissal of a case [for spoliation of evidence] is a drastic step." *Masb–Seg*, 231 Mich.App. at 401, 586 N.W.2d at 553. "Before imposing such a sanction, the trial court must consider lesser sanctions such as the exclusion of evidence that is unfairly prejudicial to defendants because of plaintiff's failure to preserve the evidence." *Id.; see also Brenner*, 226 Mich.App. at 163, 573 N.W.2d at 71. The court in *Brenner* explained that the trial judge should:

> carefully fashion[ ] a sanction that denies the party the fruits of the party's misconduct, but that does not interfere with the party's right to produce other relevant evidence. An appropriate sanction may be the exclusion of evidence that unfairly prejudices the other party or an instruction to the jury that it may draw an inference adverse to the culpable party from the absence of the evidence.

*Brenner*, 226 Mich.App. at 161, 573 N.W.2d at 70 (citation omitted).

The *Masb–Seg* case is particularly applicable to this case. *Masb–Seg* involved a plaintiff who alleged that a light manufactured by defendant caused a fire at plaintiff's building. Plaintiff failed to preserve the fire scene before suing defendant. The fire scene was investigated both by the plaintiff's hired expert and an independent fire investigator, but was destroyed before defendant's experts had a chance to investigate the scene. The plaintiff preserved all evidence that it believed was relevant to the cause of the fire but did not preserve other evidence that the defendant's expert indicated would be relevant to ruling out alternate causes of the fire. The court held that:

> Plaintiff's failure to preserve evidence from the fire scene prejudiced defendants by depriving them of the opportunity to investigate alternative causes for the fire. Therefore, the trial court properly excluded expert testimony regarding evidence that was not preserved. Contrary to defendants' contention, however, we do not believe that the drastic sanction of dismissal of plaintiff's claim was warranted in this case.

*Masb–Seg*, 231 Mich.App. at 401, 586 N.W.2d at 553 (citation omitted).

The Court finds the facts concerning spoliation of evidence in this case substantially similar to those in *Masb–Seg*. Roskam failed the preserve a fire scene before alleging that an item manufactured by APV, the oven, caused the fire. The fire scene was investigated by both Roskam's experts and at least one independent investigator, Pablo Martinez, the Grand Rapids Fire Inspector, but was destroyed before APV's experts could examine the scene. Roskam also preserved all evidence it believed was relevant to the cause of the fire, but did not preserve other evidence that the APV's expert indicated would be relevant to ruling out alternate causes of the fire.

Accordingly, the Court will follow the Michigan Court of Appeals' holding in *Masb–Seg* that dismissal is too severe a sanction. Therefore, APV's motion for summary judgment for spoliation of evidence is denied. However, the Court is very concerned about the potential for prejudice arising out of the spoliation of the fire scene and reserves the right to impose some sanction against Roskam including, but not limited to: (1) the exclu-

sion of expert testimony; (2) the exclusion of other evidence; and/or (3) an instruction to the jury that it may draw an inference adverse to Roskam from the absence of the evidence. Accordingly, the Court will allow the parties to brief what sanction, short of dismissal, may be appropriate in this case.

### Conclusion

For the foregoing reasons, APV's motion for summary judgment will be granted in part and denied in part.

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion entered on this date,

**IT IS HEREBY ORDERED** that Defendants' Motion for **Summary** Judgment re Breach of Contract & Negligence (docket no. 141) is **GRANTED IN PART AND DENIED IN PART.** Summary judgment is **GRANTED** in favor of Defendants' on Count II (Breach of Contract). Summary judgment is **GRANTED** in favor of Defendants' on paragraph 12 of Count I (Negligence—OSHA inspection). Summary judgment is **DENIED** on the remainder of Count I (Negligence—Installation of Oven).

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment re Consequential Damages (docket no. 142) and Defendants' Motion for Summary Judgment re Spoliation of Evidence (docket no. 146) are **DENIED.**

**IT IS FURTHER ORDERED** that, in accordance with the principles stated in the Opinion entered on this date, Defendants may file a motion for sanctions (other than dismissal) for spoliation of evidence within 14 days of this Order. Plaintiff may file a response brief within 14 days of service of Defendants' motion.

Defendants may file a reply brief within 7 days of service of Plaintiff's response.